GUIDRY, Justice.*
_[¿This case involves mineral rights and royalties associated with a production well located on a certain tract of land owned by the plaintiffs in Terrebonne Parish. Two conveyances are of importance to the resolution of this case: a 1966 mineral deed and a 1992 cash sale. The plaintiffs asserted the 1966 mineral deed did not create a valid mineral servitude and, consequently, sought to be declared as owning 100% of the mineral rights since then-purchase of the subject property by act of cash sale in 1992, and demanded to be awarded the royalties due from June 29, 1997, until the well stopped producing *1014 sometime in 2001 or 2002. They also sought penalties, attorney fees, and interest. The plaintiffs further asserted a violation of the Louisiana Unfair Trade Practices Act based on the allegation that various acts of the- defendants amounted to a tortious conspiracy to deprive the |2plaintiffs of the royalties due them. The trial court ruled in the plaintiffs’ favor, finding the 1966 mineral deed did not create a valid servitude over the subject property, the plaintiffs were the owners of the mineral rights as of the 1992 purchase, and the defendants’ conduct amounted to unfair trade practices. The appellate court reversed and vacated the judgment, finding that the 1966 mineral deed had created a valid mineral servitude and that the 1992 act of cash sale had placed the plaintiffs on notice that the mineral rights to the property had been previously conveyed. The appellate court then remanded the case for consideration of the remaining issues associated with any rights the plaintiffs may have acquired from settlements with predecessor mineral interest owners in 2001 and 2005.
For the reasons set forth below, we affirm the court of appeal’s judgment. We hold that the 1966 mineral deed was sufficiently specific to identify the property to be conveyed and, thus, to create a valid mineral servitude and to place third parties on notice of the existence of that servitude. We thus conclude the plaintiffs did not acquire the mineral rights to the subject property via the 1992 warranty deed. We further find that the actions of the defendants did not rise to the level of an unfair trade practice within the meaning of the act. We also affirm the remand of the case to the trial court for consideration of any royalty payment issues stemming from the after-acquired rights, if any, arising out of the 2001 and 2005 settlements.
FACTS AND PROCEDURAL HISTORY The subject property, hereinafter the St. Martin Property, consists of certain sections and portions thereof located in Townships 17 and 18 South, Range 16 East, all in Terrebonne Parish. The tract was acquired by Michael X. St. Martin and Virginia Rayne St. Martin by act of cash sale dated June 23, 1992. The vendor |3was Contran Realty Corporation, which had acquired the property from Southdown, Inc., in 1987. In pertinent part, the 1992 act of cash sale provided as follows:
VENDOR and VENDEE acknowledge, with the exception of [the] tract more particularly described on Exhibit “B”, and without intending to interrupt any prescriptive periods which may presently be accruing, that the oil, gas and other minerals lying in, on or under the subject property have been previously conveyed, and that the existence of mineral servitudes shall not constitute a failure of title under the limited warranty set forth hereinabove.
VENDOR specifically reserves all of the oil, gas and other minerals situated on or under [the] tract described on Exhibit “B”....
VENDOR and VENDEE agree that the act of sale herein is made subject to all such servitudes and/or pipeline rights of way, canal servitudes, and other noncan-celable surface leases, as are in actual existence, or of record, including without limitation, the following, to-wit:
(a) Canal Use Agreement dated January 26, 1970, by and between South-down, Inc. and Union Oil Company of California, recorded in COB 489, Folio 685, under Entry No. 376196, records of Terrebonne Parish, Louisiana.
(b) Surface Lease dated April 6, 1983, by and between Contran Corporation and The Superior Oil Company, record *1015 ed in COB 919, Eolio 627, under Entry No. 703480, records of Terrebonne Parish, Louisiana.
[[Image here]]
In pertinent part, Exhibit “B” to the 1992 cash sale stated:
A tract of land comprising 105 acres, more or less, being the Southwestern-most 105 acres more or less in the SW/4 of Section 8, T18S-R16E, Terrebonne Parish, Louisiana, a plat of which is attached as Exhibit “D” to that certain Mineral Conveyance from Southdown, Inc. to Southdown Exploration, Inc., dated August 31, 1966, recorded under Entry No. 315794, Records of Terrebonne Parish, Louisiana.
On August 15, 1994, the St. Martins conveyed a 10% mineral interest in their property to Quality Environmental Processes, Inc. (hereinafter “Quality”), and then on March 1, 2001, another 20%. Although the St. Martins and Quality, | hereinafter the plaintiffs, acknowledge that the 1992 cash sale states “that the oil, gas and other minerals lying in, on or under the subject property have been previously conveyed,” they claim there was no valid mineral servitude encumbering the property at the time of the 1992 purchase and, thus, they acquired 100% of the mineral rights in the subject property as' a result of the 1992 cash sale.
The validity of their claim, all parties agree, turns on whether a 1966 mineral deed, also referred to as the 1966 agreement, purporting to identify and convey a mineral servitude from the then owner of the property, Southdown, Inc., created a valid mineral servitude.[1] That 1966 mineral deed was created by instrument dated August 31, 1966, recorded at COB 433, Folio 128 of the records of Terrebonne Parish, in which Southdown, Inc. conveyed to Southdown Exploration, Inc. all of its rights title and interest in and to the oil, gas and other minerals located in, on or under the lands- outlined in blue on the plats marked Exhibits “A” through “H” and attached to the. 1966 agreement. These plats marked as Exhibits “A” through “H” to the 1966 agreement covered eight separate, non-contiguous areas located in four different parishes. As previously noted, on each of the plats attached to the 1966 agreement is an area outlined in blue reflecting the boundaries of the particular “Productive Area” within which Southdown, Inc. was conveying a mineral servitude to Southdown Exploration, Inc.
Exhibit “I” to the 1966 agreement lists and describes the “Known Productive Sands” within the various tracts identified in the exhibits. These sands are described by depth and geographical location, or as defined by Louisiana Department of Conservation orders.
The 1966 mineral deed provides in pertinent part as follows:
| .^SOUTHDOWN, INC., a Louisiana corporation, hereinafter referred to- as “Grantor”, does hereby grant, bargain, sell, convey, set over and deliver unto SOUTHDOWN EXPLORATION, INC., a Louisiana corporation, hereinafter referred to as “Grantee”, all of Grantor’s right, title and interest in and to the oil, gas and other minerals located in, on or under the lands outlined in blue on the plats marked Exhibits “A” through “H”, which said Exhibits are attached hereto and made a part hereof in full by reference, covering lands located in St. James, Terrebonne, Ascension and La-fourche Parishes, Louisiana. The lands *1016 outlined in blue on Exhibits “A” through “H” are herein sometimes referred to as “Productive Area”.
Grantor and Grantee herein agree to execute such further instruments as may be necessary or desirable to effect the conveyance set out herein-above; in this connection, the parties agree forthwith to cause an accurate survey to be made of each of the areas outlined in blue, and the detailed survey plats, when approved by the parties and filed of record, shall be substituted for Exhibits “A” through “H” and shall constitute a part of this agreement. It is agreed particularly that if the area outlined in blue does not include all existing units or acreage assigned to producing wells within the Productive Area, the conveyance will be ...[ 2] dated retroactively to include such additional acreage.
On the plats annexed hereto to Exhibits “A” through “C”, there is outlined in red an additional area adjacent to each of the Productive Areas shown on said plats. The lands lying between the limits of the Productive Area as outlined in blue and the red outline in each instance are hereinafter referred to as the “Protective Area”. The Protective Area shall also be surveyed forthwith; and the detailed survey plats, when approved by the parties and filed of record, shall also be substituted for Exhibits “A” through “G” and shall constitute a part of this agreement.
For all purposes of this Agreement, the sands known to be productive or capable of production in the Productive Area, which may be subject to the additional assignments herein provided for relating to the Protective Area are agreed by the parties to be described and fully identified on the descriptive list thereof attached hereto and expressly made a part hereof as Exhibit “I”, hereinafter referred to collectively as “Known Productive Sands” or individually as “Known Productive Sand”.
As an essential and integral part of the consideration paid for this conveyance, Grantor binds and obligates itself to convey to Grantee, from time to time as required, all of its right title and interest in and to the oil, gas and other minerals in each Known Productive Sand when and if such sand is established to be productive or capable of production in the Protective Area....
| „This Agreement is herein specifically made subject to the terms and conditions of the present Oil, Gas and Mineral Leases covering and affecting the Productive Area, together with all recorded agreements, instruments or documents presently in force and effect covering and affecting the said leases and presently binding upon Grantor.
This Agreement and all rights, interests and titles of the parties hereto shall be binding upon and inure to the benefit of the respective parties, their heirs, successors and assigns.
[Emphasis added.]
Although the 1966 agreement required subsequent “accurate” surveys to be made and thereafter “substituted for Exhibits ‘A’ through ‘H,’ ” the parties to the agreement did not do so.
The relevant plat to this litigation is the plat attached to the 1966 agreement as Exhibit “D”, which is a copy of a Tobin map labeled “Lake Hatch Field Sunrise Field Terrebonne Parish, LA.”[3] The des *1017 ignation “R16E” appears in large type in the lower left-hand corner, which all surveyor experts agreed corresponded to “Range 16 East.”[4] Exhibit “D” is gridded in numbered sections,[5] and, as the court of appeal noted, various topographical features are depicted: “Lake Hatch” is depicted as falling at the intersection of Sections 11, 12, and 14; the “Intracoastal Waterway” is shown as traversing Sections 1-3; the “Minor Canal” is shown as | descending through Sections 2, 12, and 13; and the names of various landowners are inscribed on tracts throughout the map. The parties stipulated to the introduction of the testimony of Keith Hebert, accepted as an expert petroleum landman, who testified that there had been continuous and uninterrupted production in the “Productive Area” of the Lake Hatch Sunrise Field delineated on Exhibit “D” from 1965 until 2002, such that the mineral rights had not prescribed. See La.Rev. Stat. 31:27 (“A mineral servitude is extinguished by ... prescription resulting from nonuse for ten years.... ”).
In 1970, Southdown Exploration conveyed 40% of the mineral rights to Energy Development Corporation (hereinafter “EDC”), which was eventually succeeded by Noble Energy, Inc. The remaining undivided 60% interest remained with South-down Exploration, whose successor was Phillips Petroleum Company (hereinafter, Phillips).
In 1987, Southdown Inc. conveyed the land to Contran Realty Corporation (hereinafter “Contran”) in 1987. As described above, Contran, by the 1992 act of cash sale, conveyed the surface rights in the property to the St. Martins.
In the meantime, IP Petroleum Company (hereinafter “IP Petroleum”) had acquired a farm-out interest under a 1954 lease originally granted to The Superior Oil Company (later succeeded by Mobil Exploration & Production U.S. Inc.). In 1994, Mobil Exploration granted IP Petroleum and Houston Energy and Development, Inc. the right to drill an exploratory well affecting parts of the property. IP Petroleum also owned various working interests pursuant to mineral leases with EDC. Additionally, IP Petroleum owned mineral rights assigned to it by Phillips.
In 1994, IP Petroleum successfully drilled and produced the IP Pet. PPCO No. 1 well on the St. Martin Property. According to the plaintiffs, they ^immediately began receiving all royalties from the production of that well through 1997 when IP Petroleum halted payments. According to IP Petroleum, the royalties *1018 from the well were paid to the owners of the 1966 mineral servitude, namely Noble Energy (as EDO’s successor) and Phillips. Pure Resources purchased IP Petroleum’s interest in the well in April 2001. Pure Resources recompleted the well, and produced minerals therefrom until the well was plugged and abandoned in September 2002.
In 2000, the plaintiffs (the St. Martins and Quality) filed suit for unpaid royalties against IP Petroleum, Noble Energy, Phillips, and Mobil Exploration, questioning the validity of the 1966 mineral deed based on the sufficiency of the blue line description on the attached Tobin map in Exhibit “D” (this suit is referred to by the parties as “Blue Line I”).[6] The plaintiffs sought inter alia a judgment recognizing their ownership of the minerals on the St. Martin Property. By this time some $817,464.29 had been paid by IP Petroleum in royalties to Noble Energy and Phillips between June 29, 1997, and April 2001, while the remaining $106,977.66 had been placed in escrow. The plaintiffs alleged the 1966 mineral deed was insufficient to create a mineral servitude and to put them on notice that mineral interests in the land they acquired in 1992 were outstanding in other persons. Mobil Exploration was dismissed from the suit. The plaintiffs settled their claims with Phillips in 2001 and with Noble Energy in 2005. In the respective settlement agreements, the plaintiffs obtained all of the mineral interests in the St. Martin Property that had belonged to both Phillips and Noble Energy, the so-called after-acquired mineral rights. IP Petroleum remained as the sole defendant. In 2006, the plaintiffs unsuccessfully attempted to amend their petition in Blue Line I to add as a defendant International Paper Company, the parent 19company of IP Petroleum, and to assert a claim for tortious conspiracy against those defendants, as well as the attorneys for IP Petroleum, John Y. Pearce and the law firm of Montgomery, Barnett, Brown, Read, Hammond & Mintz, L.L.P. (hereinafter “Montgomery Barnett”).
In 2006, subsequent to the trial court’s denial of the plaintiffs’ motion to amend their pleadings in Blue Line 1, the plaintiffs filed the instant suit against IP Petroleum and International Paper (collectively “the IP defendants”), seeking to be declared the owner of the mineral rights, again asserting a claim for unpaid royalties from 1997. In the instant suit, the plaintiffs also sought damages under the Louisiana Unfair Trade Practices Act (hereinafter “LUTPA”) against the IP defendants and IP Petroleum’s attorneys, Mr. Pearce and the law firm of Montgomery Barnett (collectively, the “legal defendants”). The instant suit was assigned to a different division of the district court than Blue Line I.[7]
Following a five-day trial, the trial court held the St. Martins owned 100% of the minerals relating to the IP Pet. PPCO Well No. 1 from the date of the 1992 cash sale and were entitled to payment of all royalties. The court found that the 1966 deed did not contain an accurate survey or map, nor any measurements, dimensions, bearings, angles, or distances which would *1019 accurately describe the various mineral interests listed and conveyed therein which would sufficiently put a third party, such as the plaintiffs, on notice and, thus, did not create a mineral servitude relative to St. Martin Property. Based on these findings, the trial court did not address the effect on mineral ownership of the 2001 and 2005 settlements |10with Noble and Phillips, respectively, which the plaintiffs urged supported their claim for production royalties paid by IP from 1997 to 2001.
The trial court further found that despite demand by the plaintiffs, the IP-defendants, without legal justification or reasonable grounds, willfully and deliberately refused to pay mineral royalties in the total amount of $924,441.95 to the plaintiffs. The trial court found that the IP-defendants’ actions were in violation of La. R.S. 31:137, et seq., and were willful, deliberate, unjustified, and unreasonable for which the plaintiffs were also entitled to recover damages equal to double the amount of royalties, interest from July 1, 1997 (the date royalties were due), and reasonable attorney fees (25% of royalties, penalties, and interest). The trial court also found that the defendants’ conduct amounted to a violation of LUTPA, as discussed in more detail below.
Accordingly, judgment was rendered in favor of the plaintiffs, decreeing 100% ownership of the mineral rights in the plaintiffs, and ordering the IP defendants to pay a total of $6,725,375.98 in unpaid royalties, penalties (twice the royalties due), interest on unpaid royalties and penalties from July 1, 1997, through October 28, 2011, and 25% attorney fees. As to the LUTPA claim, the judgment ordered the IP-defendants and the legal defendants to pay a total of $4,549,227.91 in penalties (triple unpaid royalties), interest on treble damages from date of demand, and 25% attorney fees.
On appeal, the court of appeal found that the 1992 cash sale to the St. Martins did not transfer any mineral rights in the property sold, as the parties thereto expressly stated that no mineral rights in the property were being conveyed; therefore, the St. Martins had actual notice that the mineral rights were owned by some other person(s). . The appellate court further concluded that the public records were, at all pertinent times, sufficient to give the plaintiffs notice that they did not |nobtain ownership of any mineral rights by virtue of the 1992 cash sale, as the 1966 conveyance of mineral rights and subsequent transfers to successors-in-title were sufficient notice of such title in other persons. The court reasoned that the 1966 mineral deed, even though it did not contain a complete written description of the property, was nevertheless susceptible of conveying property, because the servitude could be ascertained with certainty with the aid of such extrinsic evidence as is admissible under the rules of evidence.
The court of appeal reversed the trial court’s holding that the St. Martins had obtained 100% ownership rights in 1992, encompassing the mineral rights at issue, and in awarding damages, penalties, interest, attorney fees, and costs to Ps in this matter. Accordingly, the court vacated the trial court’s judgment. Because the trial court had not considered the plaintiffs’ claims in connection with the mineral interest obtained by virtue of their 2001 and 2005 settlements with Phillips and Noble, the court remanded the matter stating:
Because the ruling by the trial court obviated the need for the trial court to render judgment as to the plaintiffs’ claims based on after-acquired titles to the mineral rights at issue (i.e., by subsequently-acquired mineral deed(s) and/or settlement agreement(s) by *1020 and/or with Noble Energy, Inc. and/or Phillips Petroleum Company), we remand for a ruling on these claims by the trial court.
Urging that the court of appeal’s remand order did not remand any LUTPA claim or any claim against the legal defendants, both the IP defendants and the legal defendants unsuccessfully sought rehearing for the limited purpose of requesting the court of appeal to dismiss the plaintiffs’ LUTPA claims against all defendants. The plaintiffs, the IP defendants, and the legal defendants each filed writ applications in this court seeking review. We granted all three writ applications to determine whether the lower courts properly applied the law. Quality Environmental Processes, Inc. v. IP Petroleum Company, Inc., 13-1582, 13-1588, 13-1703 (La.12/06/13), 129 So.3d 524.
|12THE 1966 MINERAL DEED
As noted above, all parties agree that this case turns on whether the 1966 mineral deed validly created and conveyed a mineral servitude encumbering the St. Martin Property. There can be no doubt from the express terms of the 1966 agreement itself that the parties thereto intended to grant a mineral servitude as outlined by the blue line on the Tobin map attached as Exhibit “D” for the Lake Hatch-Sunrise Field in Terre-bonne Parish. See La. Civ.Code art. 2045 (“Interpretation of a contract is the determination of the common intent of the parties.”). However, whether that 1966 agreement legally conveyed a mineral servitude turns on whether the property to be conveyed was sufficiently described, by incorporating the reference to the blue outlined “Productive Area” on the attached Tobin map in Exhibit “D” and the “Productive Sands” identified in Exhibit “I”, was sufficient to convey immovables under applicable Louisiana law and to put the St. Martins as surface owners on notice. Accordingly, we turn to the applicable law for determining the validity of a mineral servitude.
The standard of review applicable in this case is de novo, as the existence of a mineral servitude presents a question of law. See First National Bank, USA v. DDS Constmction, LLC, 11-1418 (La.1/24/12), 91 So.3d 944. Mineral leases are classified as incorporeal immovable property, and as such, they are subject to the public records doctrine as provided in the Louisiana Civil Code. La.Rev.Stat. 31:18. The question in this case is whether the 1966 mineral deed contained a sufficient property description as to put third parties on notice.
It has long been the rule that “[t]he description in a deed must be such that the property intended to be conveyed can be located and identified, and the general rule is that the description must fully appear within the four corners of the | ^instrument itself, or that the deed should refer to some map, plat, or deed as a part of the description, so that the same may be clear.” Daigle v. Calcasieu Nat’l Bank in Lake Charles, 200 La. 1006, 9 So.2d 394, 397 (1942). However, Louisiana jurisprudence has not established precise criteria to determine what description in the public records is sufficient to place third persons on notice, and such determination is to be made on a case by case basis. Nitro Energy, LLC v. Nelson Energy, Inc., 45,201 (La.App. 2 Cir. 4/14/10), 34 So.3d 524 (citing Santopadre v. Pelican Homestead and Sav. Ass’n, 782 F.Supp. 1138 (E.D.La.1992), and Peter Title, Louisiana Real Estate Transactions § 8:9 (2009)). Indeed, in Consolidated Ass’n of Planters of Louisiana v. Mason, 24 La. Ann. 518 (1872), this court recognized the impossibility of adopting a standard for distinguishing a description that would be *1021 sufficient from one which would not be sufficient to put third parties on notice, noting that “[w]e are not prepared to fix the line between a valid and invalid or sufficient and insufficient description, which shall serve as a guide in all future cases. Each case must depend on its own circumstances.” Accordingly, Louisiana courts have been liberal in construing the description of property in deeds, so as to sustain, rather than defeat, the conveyance. Emerson v. Cotton, 209 La. 1003, 26 So.2d 16 (1946); Nitro Energy, supra (“while not entirely and completely accurate in and of itself, the property in the Faust lease is described with a degree of particularity so as to leave no doubt as to the property intended to be affected”).
In White v. Ouaehita Natural Gas Co., Inc., 177 La. 1052, 1059-60, 150 So. 15, 17 (1933), this court summarized the rule regarding the sufficiency of a description insofar as third parties and notice is concerned as follows:
“It suffices if the description be such as to enable the court to determine with certainty, with the aid of such extrinsic evidence as is Inadmissible under the rules of evidence, what property was intended by the parties to be covered thereby. The description need not be given with such particularity as to make resort to extrinsic evidence unnecessary.” Tircuit v. Burton-Swartz Cypress Co., 162 La. 319, 110 So. 489, 492. Therefore, whilst an unrecorded deed can have no effect whatever on third persons, the same is not true where the deed is recorded but contains only an inaccurate or faulty description of the property but not so inaccurate or faulty as to be actually misleading. Hence when the only description in a mortgage was “one large property or tract at the corner of Orleans and Bourbon Streets” without any other boundaries given, this was held sufficient to put a purchaser on his guard. Roberts v. Bauer, 35 La.Ann. 453, citing City Bank v. Denham, 1844 WL 1351, 7 Rob. (LA) 39 (1844), and Ells v. Sims, 2 La.Ann. 251 (1847). See also■ Lee v. Long, 166 La. 1084, 118 So. 320 (1928).
Of course where the description in the recorded deed is so misleading that it actually describes accurately some other property than that mortgaged or sold, a purchaser is not only not put on his guard thereby, but is actually put off his guard, and in such case a resort to outside evidence would have the effect not merely of making the description certain, but of actually changing the record; and this cannot be allowed. Ducre v. Milner, 165 La. 433,115 So. 646; Sentell v. Randolph, 52 La.Ann. 52, 26 So. 797; Haas v. Fontenot, 132 La. 812, 61 So. 831; Roussel v. Railways Realty Co., 132 La. 379, 61 So. 409, 833; Williams v. Raymond, 163 La. 764, 112 So. 713 [(1927)].
White v. Ouachita Natural Gas, 177 La. at 1059-60, 150 So. at 17 (Emphasis in original).
Our review of the record in this case leads us to agree with the court of appeal that the plaintiffs did not acquire any mineral interest through their 1992 land acquisition, because the 1966 mineral deed was, and is, effective against third parties and “sufficiently specific” to create a mineral servitude showing that mineral interests were outstanding in other persons. Exhibit “D” to the 1966 mineral deed contains the blue outline on a Tobin map delineating the intended servitude area.
Ralph Gipson, accepted by the court as an expert professional land surveyor, testified that he was readily able to identify the blue lined “Productive Area” on the |1fiTobin map attached as Exhibit “D” to the 1966 agreement. He explained in *1022 depth his process of examining the Tobin map, as well as the origins of such maps, and his use of Exhibit “I” identifying the “Productive Sands,” which identified the township and range corresponding to the blue outline: He described in detail his method of plotting the outline of the “Productive Area” using public records such as well locations identified on the Tobin map, range and section lines, and prior surveys by surveyors in the public records such as T. Baker Smith. He also compared his interpretation of the “Productive Area” to that prepared by Charles Camp, who had been accepted as an expert professional surveyor and had prepared a plot of the blue and red outlines on Exhibit “D” for the plaintiffs in a related case. Mr. Gipson explained how both he and Mr. Camp had made different assumptions to ascertain certain boundaries of the “Productive Area.” In that regard, Mr. Camp, testifying in an earlier case, explained how he had used grid ticks from the Louisiana Coordinate System (South Zone), as well as surveys made by T. Baker Smith, rather than simply the section lines and other criteria used by Mr. Gipson. Mr. Camp, in the transcript of his testimony introduced in this case, also agreed that Tobin maps are worthwhile maps in terms of accuracy for surveying situations.
Mr. Gipson explained that every survey- or makes different assumptions, such that no two surveys of the same property would be expected to be absolutely identical. He explained that agreement, rather than identity, between different surveys would be professionally acceptable, and noted that the plot he created and the plot created by Mr. Camp differed by only about 3.6 acres out of a total area of some 1200 acres. When questioned on whether the same acreage could have different shapes, Mr. Gipson noted that the 1966 agreement did not specify an acreage and that, at any rate, the shape of the “Productive Area” was clearly set 116forth on the Tobin map labeled as Exhibit “D”. Although Mr. Gipson, and to his knowledge, no other party had performed a survey of the “Productive Area” on the ground, Mr. Gipson stated that such a survey could readily be made and, in fact, he had prepared a legal description of the intended servitude, introduced via his affidavit. Mr. Gipson allowed as he believed that the interpretation of the “Productive Area” made by Mr. Camp for the plaintiffs might have been more accurate in certain places, but he believed that the two interpretations were in substantial agreement.
Charles Rembert, accepted as an expert land surveyor, testified for the plaintiffs. He explained that, using updated Tobin maps for Terrebonne Parish, he was able to identify the “Productive Area” delineated on Exhibit “D” using the grid tick found on Exhibit “D”. However, he pointed out that different assumptions could be made, for example as to the width of the blue line itself, such that there could be variations in the shape and acreage of the “Productive Area.” He prepared plots and charts showing such variations. Accordingly, he opined that the “Productive Area” was not readily identifiable from the 1966 agreement because it lacked identifying marks and other information.
We do not find the property description in the 1966 mineral deed to be insufficiently descriptive as to be so misleading that it describes some other property than what the parties to the 1966 agreement intended to convey. See White v. Ouachita Natural Gas, 177 La. at 1060, 150 So. at 17. Notably, this is not a boundary action, wherein the court would be called upon to fix the actual boundaries of the servitude. Moreover, there is no doubt that the subject well and relevant portion of the St. Martin Property fall within the “Productive Area” delineated on Exhibit “D”. Thus, we are *1023 only called upon to determine whether 117the property description was sufficient to put third parties on notice that the property was encumbered by a mineral servitude. Exhibit “D” in conjunction with Exhibit “I” clearly identifies the township, range, and section number of land in Terrebonne Parish. While Exhibit “D” does not detail measures of the lines and angles, it clearly identifies the sections affected by the mineral servitude.
Although the parties to the 1966 mineral deed clearly intended to perform surveys to reform the property description so as to be more precise, nothing in the agreement provides that the lack of such a survey would invalidate the deed for want of an adequate property description. Furthermore, we conclude the property description in the 1966 mineral deed (the Tobin map when considered with other exhibits to the deed) was not so inaccurate or faulty as to be misleading, because the Tobin map and other matters of public record, along with admissible extrinsic evidence, furnished ample means of identifying the property the parties to the 1966 agreement intended to encumber with a mineral servitude, and thus the description of the property in the 1966 agreement was sufficient to serve as notice to third persons that the property was burdened by a mineral servitude. See H.J. Smith & Sons v. Baham, 157 La. 524, 102 So. 657, 658 (1925). Because we find the property intended by the parties to be encumbered by the servitude outlined in the 1966 agreement and the exhibits thereto can be determined with certainty, with the aid of extrinsic evidence, we affirm the court of appeal’s judgment holding in that regard.[8]
|1STHE LUTPA CLAIM
Although the court of appeal did not directly address the merits of the plaintiffs’ LUTPA claim, we do so now, and, after reviewing the law and the record, conclude the trial court erred in finding a violation of LUTPA and awarding damages. The plaintiffs alleged the defendants violated LUTPA, set forth at La. Rev.Stat. 51:1401 et seq.[9] Specifically, the plaintiffs alleged that IP Petroleum refused to pay royalties to the plaintiffs and had further instructed Phillips, which had been paying royalty payments after withholding its own royalty interest, to suspend royalty payments as a result of the Blue Line I case being in litigation. The plaintiffs alleged that, even after obtaining the mineral rights owned by Phillips in 2001 and Noble in 2005, IP Petroleum refused to pay royalties due. The plaintiffs alleged that Mr. Pearce, the lawyer for IP Petroleum, was informed of the settlements, such that no party was then claiming royalties adverse to the plaintiffs, but still IP Petroleum and Pure Resources refused to turn over the royalty payments. In the Blue Line I matter, the *1024 plaintiffs alleged, the defendants had failed to comply with numerous discovery requests resulting in judgments compelling IP Petroleum to comply and being cast with sanctions. The plaintiffs alleged that the defendants failed to disclose, among other documents, IP Petroleum’s request that Pure Resources suspend payments, the agreement wherein IP Petroleum sold its resources to Pure Resources, but maintained a 51% interest in Pure Resources, and the contribution agreement between IP Petroleum and Pure Resources. The plaintiffs also alleged that the defendants failed to disclose a purported agreement between Pure Resources and the legal defendants that IP Petroleum would file a concursus proceeding regarding approximately $107,000 in |13royaIty payments arising from production from the subject well. The plaintiffs allege the legal defendants withheld the check from Pure Resources for some eight months before depositing it into the law firm’s trust account. The plaintiffs alleged that the legal defendants attempted to coerce them into settling by offering them only a portion of the escrowed royalties, when they were entitled to 100% of those royalties. Finally, the plaintiffs alleged the defendants caused IP Petroleum to be “judgment proof’ and failed to disclose the relevant agreement to them. The trial court found all of these allegations to be supported by the evidence and granted judgment in favor of the plaintiffs.
Ultimately, the trial court found that as a result of the violations of LUTPA, the plaintiffs were not paid $924,441.95 of their earned mineral royalties from the St. Martin Property, and thus, per La. R.S. 51:4109, they were entitled to recover damages in the amount of three times that amount, plus interest, from the date of judicial demand on December 1, 2006, in addition to 25% of attorney fees.
We granted the defendants’ writ applications to determine whether the defendants’ discovery violations, their failure to reveal to the St. Martin Group that $106,977.66 in royalties claimed by the St. Martin Group was being held by Mr. Pearce and Montgomery Barnett, and the defendants’ failure to provoke a concursus as required by an agreement regarding the tender of royalties, violated LUTPA. The legal defendants argued that the court of appeal had effectively dismissed the LUTPA claim, after finding that the plaintiffs had no right to the royalties, and furthermore, that the plaintiffs’ LUTPA claim is unprecedented. Specifically, the legal defendants contend the dispute is merely a discovery dispute and as such, its elevation into a LUTPA lawsuit has no statutory or jurisprudential foundation because discovery disputes are resolved by the courts in which the |2ndispute arose, to be supplemented only by the Supreme Court’s authority to regulate the practice of law. Additionally, the legal defendants purport that there was no binding “concursus agreement” between Pure Resources and the IP defendants because Pure Resources never signed the IP defendants’ proposed agreement. Thus, the legal defendants owed no duty to the plaintiffs under the agreement. Lastly, the legal defendants contend that Mr. Pearce did not file a concursus action because ownership of the royalties was already being disputed in a pending lawsuit, and it made no sense to invoke another action on the same dispute, especially since concursus is an optional, not mandatory, procedure, as claimants to a fund have no statutory right to require a concursus.
In response, the plaintiffs argue that the LUTPA judgment still applies because the court of appeal vacated the trial court’s judgment without mentioning the LUTPA judgment and remanded only the after- *1025 acquired titles claim. The plaintiffs emphasize that the appellate court did not rule that the defendants were not liable for (1) breaching the agreement between Pure Resource and the IP-Defendants; (2) being in bad faith; (3) withholding royalties from the St. Martins; (4) misleading the St. Martins; or (5) breaching LUTPA. Rather, they contend the court of appeal remanded the matter for the trial court to make those determinations.
We agree with the defendants that elevating what is essentially a discovery dispute to the level of a LUTPA violation is unprecedented in our jurisprudence. No party, nor the trial court, has cited a case or statute affirmatively stating that such a dispute can or cannot rise to the level of an LUTPA claim. However, the policies behind the LUTPA and the statutes governing discovery disputes provide some guidance in determining that the alleged conduct of the legal defendants and |aithe IP defendants should be governed by the relevant discovery statutes rather than LUTPA.
In LUTPA, the legislature declared it to be unlawful to engage in “unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.” La.Rev.Stat. § 51: 1405. Because of the broad sweep of this language, “Louisiana courts determine what is a LUTPA violation on a case-by-case basis.” Keith E. Andrews, Comment, Louisiana Unfair Trade Practices Act: Broad Language and Generous Remedies Supplemented by a Confusing Body of Case Law, 41 Loy. L.Rev. 759, 762 (1996) (hereinafter “Andrews”). This court has consistently held that in establishing a LUTPA claim, a plaintiff must show that “the alleged conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious.” Cheramie Services, Inc. v. Shell Deepwater Prod., 09-1633, p. 11 (La.4/23/10), 35 So.3d 1053, 1059. “[T]he range of prohibited practices under LUTPA is extremely narrow,” as LUTPA prohibits only fraud, misrepresentation, and similar conduct, and not mere negligence. Id. at 11, 35 So.3d at 1059; Andrews, 41 Loy. L.Rev. at 763. Moreover, conduct that offends established public policy and is unethical is not necessarily a violation under LUTPA. See, e.g., Chera-mie Services, 09-1633 at 12, 35 So.3d at 1060 (“[0]nly egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct will be sanctioned based on LUTPA.”); Vermilion Hosp., Inc. v. Patout, 05-82, p. 6 (La.App. 3 Cir. 6/8/05), 906 So.2d 688, 693 (noting that not all violations of the Louisiana Code of Ethics give rise to a cause of action under LUTPA and that persons aggrieved by such violations of the code of ethics are permitted to file a complaint with the Louisiana Board of Ethics or seek remedies under other statutes).
^Notably, LUTPA was modeled after the Federal Trade Commission Act (hereinafter “FTC Act”), and the two acts share the same goals: to protect consumers and to foster competition. See Andrews, 41 Loy. L.Rev. at 777. Specifically, these goals include halting unfair business practices and sanctioning the businesses which commit them, preserving and promoting effective and fair competition, and curbing business practices that lead to a monopoly and unfair restraint of trade within a certain industry. See, e.g., Slough v. Fed. Trade Comm’n, 396 F.2d 870 (5th Cir.1968), cert, denied, 393 U.S. 980, 89 S.Ct. 448, 21 L.Ed.2d 440 (1968) (“The aim of the [Act] is to stamp out unfair business practices and businesses which persist in practicing them.”); United States v. St. Regis Paper Co., 355 F.2d 688 (2d Cir. 1966) (noting that the policy of the FTC *1026 Act is to promote and preserve competition); Northern Warren Corp. v. Fed. Trade Comm’n, 59 F.2d 196 (2d Cir.1932) (“[The purpose of the Act] is to strike down at their inception practices which are unfair and which, if permitted to run their full course, would result in the creation of a monopoly and an undue- restraint of trade.”).
However, the goals of LUTPA were not intended to ensure ethical and fair cooperation between attorneys litigating a case. This goal is met by Louisiana’s discovery statutes, the basic objectives of which are:
(1) to afford all parties a full and fair opportunity to obtain facts pertinent to litigation, (2) to discover the true facts and compel disclosure of these facts wherever they may be found, (3) to assist litigants in preparing their cases for trial, (4) to narrow and clarify the basic issues between the parties, and (5) to facilitate and expedíate the legal process by encouraging settlement or abandonment of less than meritorious claims.
Hodges v. S. Farm Bureau Cas. Ins. Co., 433 So.2d 125, 129 (La.1983). Louisiana courts construe these discovery statutes liberally and broadly to ensure that these objectives are met. Id.
_[sK¡In the case at hand, the plaintiffs essentially allege two actions leading to a LUTPA violation: (1) the defendants failed to disclose, despite several interrogatories and requests for production, to the plaintiffs that the defendants were in possession of . the mineral royalty funds; and (2) the defendants failed to invoke a con-cursus proceeding after receiving the funds. We find that such actions do not rise to the level of a violation of LUTPA, even though they may violate rules pertaining to discovery or ethical conduct. See Thibaut, Thibaut, Garrett and Bacot v. Smith and Loveless, Inc., 576 So.2d 532, 537 (La.App. 1st Cir.1990) (LUTPA is an act of the legislature and cannot be applied to regulate or define the practice of law, including the conduct of attorneys). In the Blue Line I case, the defendants were in fact found to have violated discovery rules and were ordered to comply and were sanctioned by the trial court. The plaintiffs have not sought review of the trial court’s discovery rulings in the Blue Line I case. Additionally, a concursus proceeding is not required by law, although it is a permitted procedure when a party is faced with competing or conflicting claims. See La.Code Civ. Proc. art. 4562. Here, the defendants reasonably believed that such a proceeding was not necessary because the plaintiffs had already asserted their claim for unpaid royalties in the pending Blue Line I case. In sum, the defendants’ actions in this case do not violate LUTPA because they do not fall under the protection of LUTPA’s narrow goal of protecting against egregious actions of fraudulent, deceitful, and unfair business practices to promote and foster healthy and fair business competition. Rather, the defendants’ actions are more appropriately governed by our Code of Civil Procedure’s discovery rules, which are meant to afford all parties to a lawsuit full and fair opportunities to obtain facts pertinent to the litigation. Accordingly, we conclude the trial court under the facts of this case erred in finding the defendants violated the provisions of LUTPA.
1 ^CONCLUSION
For the reasons set forth above, we affirm the court of appeal’s decision to vacate the trial court’s judgment in favor of the plaintiffs. We hold that the 1966 mineral deed was sufficiently specific to identify the property to be conveyed and, thus, to create a valid mineral servitude and to place third parties on notice of the existence of that servitude. We thus con- *1027 elude the plaintiffs did not acquire the mineral rights to the subject property via the 1992 cash sale. We further End that the actions of the defendants did not rise to the level of an unfair trade practice within the meaning of LUTPA. Accordingly, the plaintiffs’ claims under LUTPA are dismissed as to both the IP defendants and the legal defendants. We also affirm the remand of the case to the trial court for consideration of any royalty payment issues stemming from the after-acquired rights, if any, arising out of the 2001 and 2005 settlements.
AFFIRMED; RENDERED IN PART; CASE REMANDED TO THE DISTRICT COURT FOR FURTHER PROCEEDINGS.
JOHNSON, Chief Justice, dissents in part for reasons assigned by Justice KNOLL.
KNOLL, Justice, dissents in part and assigns reasons.
CLARK, Justice, concurs in part and dissents in part for reasons assigned by Justice KNOLL.
Retired Judge LEMMIE O. HIGHTOWER, assigned as Justice ad hoc, sitting for HUGHES, J., recused.

 Retired Judge Lemmie O. Hightower, sitting Justice ad hoc for Hughes, J., recused.

. La.Rev.Stat. 31:21 provides that "A mineral servitude is the right of enjoyment of land belonging to another for the purpose of ex- - ploring for and producing minerals and reducing them to possession and ownership."

. The copy of the 1966 mineral deed filed into evidence is illegible in parts.

. Tobin maps are produced with the assistance of aerial photography and have long *1017 been used in Louisiana public records and the oil and gas industry.

. Defendants’ expert Ralph Gipson indicated he immediately could discern from his familiarity with the area the township and range, but also referenced Exhibit "I” to the 1966 mineral deed, which listed and described all of the "Known Productive Sands” for which mineral rights were being conveyed in the “Lake Hatch-Sunrise Field, Terrebonne Parish, Louisiana," and these were stated as being in "Range 16 East.” Plaintiffs’ expert Mr. Rembert testified that he used updated Tobin maps and superimposed Exhibit "D” onto the more current Tobin map for Terrebonne Parish using the grid tic found on Exhibit "D”.

. Section, township and range signify the division of land west of the Appalachians adopted by the U.S. Government in 1785. Townships are squares of 36 square miles, and a series of townships constitutes a Range. Each township may be divided into sections of one square mile. All divisions are related to a base meridian. In Exhibit "D” to the 1966 Agreement, the Section numbers appearing on the map, reading from the upper left-hand corner, include: 83, 82, 60, 61, 62, 63, 64, 65, 66, 1, 2, 3, 10, 11, 12, 13, 14, and 15).

. The parties do not dispute that any claims for royalties due prior to June 29, 1997, had prescribed at the time of the suit filed in 2000.

. In the 2006 action, IP Petroleum’s motions to strike and exceptions of no cause of action, no right of action, and lis pendens were denied/overruled by the trial court on May 23, 2007. The defendants’ applications for supervisory review as to the motions and exceptions were denied. See Quality Environmental Processes, Inc. v. IP. Petroleum Company, Inc., 07-1080, 07-1081 (La.App. 1 Cir. 8/7/07) (unpublished).

. As further support for our finding that the 1966 mineral deed conveyed mineral rights and created a mineral servitude in the "Productive Area" in the Lake Hatch Sunrise Field in Terrebonne Parish, and was sufficient to put third parties on notice of such servitude, we note in passing that the plaintiffs in the instant action, wherein they presently assert the 1966 mineral deed was insufficient to convey any mineral rights, have previously taken a contrary position in other litigation concerning mineral rights in the "Protective Area.” See Energy Development Corp. v. Quality Environmental Processes, Inc., 00-314 (La. App. 5 Cir. 12/4/00), 777 So.2d 481, writ denied, 01-0010 (La.3/9/01), 786 So.2d 734; Mandalay Oil & Gas, L.L.C. v. Energy Development Corp., 01-0993 (La.App. 1 Cir. 8/4/04), 880 So.2d 129, writ denied, 04 — 2426 (La. 1/28/05), 893 So.2d 72.

. La.Rev.Stat. 51:1405 provides that "[ujnfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.”