McCALLUM, J.
*1162 Though somewhat diminished by the passage of time, the tsunami waves generated by an economic earthquake, consequent of an alleged attempt by Texas oil tycoons to corner the world market in silver, are still washing against distant shores. This now almost mythical silver seismic event, that once shook the very foundations of the great financial houses of Wall Street, again demonstrates its continuing effects by precipitating the litigation that currently lies before us.
At issue in this concursus proceeding are mineral interests that were owned by a bankruptcy debtor. These interests were conveyed by the debtor to the bankruptcy trustee. The same interests were later conveyed to third parties outside the trustee's chain of title. The trial judge found that the bankruptcy trust agreement needed to be recorded in order to affect third parties, and that an omnibus property description in the trustee's deed did not give adequate notice to the third parties who later acquired adverse ownership interests. Those parties who trace their ownership of the mineral interests to the trustee's deed appeal the judgment.
FACTS
H.M. Lewis and his daughter Caroline Lewis Hunt were shareholders in Lewis Realty Corporation. When Lewis Realty was liquidated in 1951, H.M. Lewis and Caroline received undivided 93/440 and 5/440 interests respectively in various immovable property, including 20 acres in Jackson Parish described as the E/2 of SE/4 of SW/4 of Section 2 in T-16-N, R-2-W ("the property"). Caroline was married to Nelson Bunker Hunt at the time. Her interest in the property was her separate property.
In an act of acknowledgement executed in 1970, H.M. Lewis, Caroline Hunt, and several others stated that they had conveyed the property to Jaclin Corporation in 1951 while reserving their mineral rights. The act was executed to recognize the ownership of the mineral interests in the property. H.M. Lewis was shown to have an 1860/8800 interest, while Caroline had a 100/8800 interest. An act of correction was executed in 1971 to reflect that H.M. Lewis's undivided mineral interest in the property was actually a 2045/8800, or 0.2323 interest.
In 1977, Caroline received ownership of one-third of her father's 0.2323 mineral interest in the property through his succession. This was subject to a usufruct in *1163 favor of her mother, who received the remaining two-thirds ownership of the 0.2323 mineral interest.
On October 1, 1980, Caroline Hunt and other mineral interest owners entered into a mineral lease with Jaclin Corporation regarding the property.
Some eight years later, in the wake of the lingering aftermath of "Silver Thursday," Caroline and Nelson Bunker Hunt filed for Chapter 11 bankruptcy in Texas. In November of 1989, the parties to the bankruptcy proceedings entered into a Joint Plan. This Joint Plan was confirmed by order of the bankruptcy court in December of 1989, with the order approving the NBH Liquidating Trust Agreement ("Agreement") and establishing the NBH Liquidating Trust ("Trust"). The order also provided that on the effective date, all of the property of the debtors' estate except for retained assets would vest in the independent trustee in his capacity as trustee of the Trust.
Effective January 8, 1990, Caroline Lewis Hunt and Nelson Bunker Hunt executed a deed and assignment of leases and bill of sale without warranty in favor of R. Carter Pate as trustee. This is known at the "Pate deed." At the time, Caroline owned a 0.08181 interest in the property comprising her own interest through the liquidation and the interest that she had acquired through her father's succession.
The Pate deed was recorded in Jackson Parish on February 6, 1992. It conveyed (underlining in original):
(1) the wells described on Exhibit "A" attached hereto and incorporated herein by reference for all purposes (collectively, the "Wells" or singularly, a "Well"); and all mineral estates, mineral leases, oil and gas leases, oil, gas, hydrocarbons and mineral leases and other interests of any kind whatsoever in any mineral estate, together with all oil, gas and other minerals produced therefrom, whether known or unknown, metallic or nonmetallic, common or unique (and the proceeds of the sale thereof), including, without limitation, gravel, shale, lignite, sulphur, gold, silver, lead, zinc, copper, iron, coal, gas, oil, casinghead gas, other hydrocarbons, uranium, steam, geothermal energy and all other minerals or substances and all royalty interests, overriding royalty interests, net profits interests, production payments and similar interests described in Exhibit "A", any amendments, renewals, extensions, replacements or modifications thereof, and each and every kind and character of right, title, claim or interest which Grantors have in and to the interests, properties and lands set forth on Exhibit "A", and any other surface estates, in the above-referenced County and State as of the Effective Time (as hereinafter defined)(collectively, the "Leases"). The description of the Wells in Exhibit "A" and the description of the Leases in Exhibit "A" are not intended to limit each other, it being the intent of the Grantor and Grantee that this Deed convey every interest of Grantor in and to the Leases described in Exhibit "A" irrespective of whether the extent to which any Well is located on, includes or is related in any such Lease, and that this Deed convey every interest of Grantor in and to every Well described in Exhibit "A" irrespective of whether or the extent to which any such Well is located on or related to any Lease.
Collectively, all of the foregoing items being conveyed under this paragraph (1) are referred to as the "Lease Interests."
(2) The following properties and rights, or portions thereof, to the extent and only to the extent they relate to or cover the Lease Interests or the Wells:
*1164 (a) All unitization, unit operating, commuitization, and pooling agreements and orders directly relating to or appertaining to the Lease Interests or the Wells[.]
.....
All of the rights, lands, and interests described in paragraphs (1) and (2) above are collectively referred to as the "Properties."
.....
The Exhibit "A" referred to in the Pate deed and attached thereto stated:
Exhibit "A" to the certain Assignment from Nelson Bunker Hunt and Caroline Lewis Hunt, Debtors, to be effective January 8, 1990, pertaining to lands located in Jackson Parish, Louisiana.
Davis Brothers A-1 & C-1 E/2 Sec. 21 & W/2 Sec. 22, T-16-N, R-2-W McDowell SW/4 Sec. 2, SE/4 Sec. 3, NE/4 Sec. 10, NW/4 Sec. 11, all T-16-N, R-2-W Breedlove N/2 Sec. 3, T-16-N, R-2-W & S/2 Sec. 34, T-17-N, R-2-W
The Pate deed made reference to the Joint Plan and an August 30, 1990, compromise settlement agreement, stating:
By Order Confirming Joint Plan of Reorganization dated December 18, 1989, in Case No. 388-35726-HCA-11 (Chapter 11)(the "Order") the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, confirmed and modified that certain Joint Plan of Reorganization wherein Nelson Bunker Hunt and Caroline Lewis Hunt (the "Hunts") are the debtors (the "Plan"). Paragraph 10 of the Order and Sections 5.2(a) and 5.2(f) of the Plan provide that title to the Properties was vested in Grantee on January 8, 1990. This Deed Without Warranty is being executed, delivered, accepted and recorded merely to memorialize and to place of record, in conformance with applicable state law, the transfer of the Properties which occurred on January 8, 1990. All rights and interests transferred to the Trustee in the Properties are established by the Plan and by that Compromise Settlement Agreement dated August 30, 1990 (the "Agreement"), and neither the Grantor nor the Trustee by this Deed Without Warranty intend to modify, alter or amend those rights or interests.
As noted above, the Pate deed was recorded in Jackson Parish on February 6, 1992. On that same date, a "Release and Termination of Memorandum of Non-Productive Interests" executed by the Hunts was also recorded in Jackson Parish. It was to have an effective date of January 8, 1990, and it provided that: (1) title to the property in Exhibit A vested in Pate on January 8, 1990; (2) a dispute had arisen between the Hunts, the Trustee, and others over the ownership of the property transferred under the Plan; (3) the Hunts had filed a memorandum of interest in nonproductive interests in Jackson Parish regarding the property; (4) the Hunts, the Trustee, and other parties had entered into a settlement agreement as of August *1165 of 1990 regarding ownership of the property; and (5) ownership of the interests in the property was governed by the plan, the order, and the settlement agreement. The Exhibit A attached to the release was identical to the Exhibit A attached to the Pate deed.
Through a deed and assignment of leases and bill of sale recorded in Jackson Parish on February 6, 1992, Pate, as trustee, conveyed mineral interests to several parties, including Robena. This was known as the "Robena deed." The Robena deed conveyed the following:
(1) Any and all wells situated on the lands described on Exhibit "A" attached hereto and incorporated herein by reference for all purposes (collectively, the "Wells" or, singularly, a "Well"); and all mineral estates, mineral leases, oil and gas leases, oil, gas, hydrocarbons and mineral leases and other interests of any kind whatsoever in any mineral estate, together with all oil, gas and other minerals produced therefrom, whether known or unknown, metallic or nometallic, common or unique (and the proceeds of the sale thereof), including, without limitation, gravel, shale, lignite, sulphur, gold, silver, lead, zinc, copper, iron, coal, gas, oil, casinghead gas, other hydrocarbons, uranium, steam, geothermal energy and all other minerals or substances and all royalty interests, overriding royalty interests, net profits interests, production payments and similar interests described in Exhibit "A", any amendments, renewals, extensions, replacements or modifications thereof and each and every kind and character of right, title, claim, or interest which Grantor has in and to the interests, properties and lands set forth on Exhibit "A" (collectively, the "Leases").
(2) The following properties, rights and contracts, or portions thereof, to the extent and only to the extent they relate to or cover the Wells and the Leases:
(a) All unitization, unit operating, communization, and pooling agreements and orders directly relating to or appertaining to the Wells and the Leases[.]
.....
All of the rights, lands, and interests described in (1) and (2) above are collectively referred to as the "Properties." Provided, however, that the term "Properties" shall not mean or include, and Grantor hereby expressly reserves and retains, any and all rights, claims, interests and other property which would otherwise constitute a portion of the "Properties" covered hereby, insofar as such rights, claims, interests or other property cover, constitute, relate to or are attributable to any lands that are not included, as of the Effective Time, within an existing proration, production or spacing unit, as prescribed by an applicable governmental authority or as otherwise exists by virtue of an existing contractual arrangement, for an oil and/or gas well or a unit that is specifically described in Exhibit "A" attached hereto.
The bottom of each page of the Robena deed contained the assertion: "THIS IS AN ASSIGNMENT OF PRODUCING PROPERTIES." Exhibit "A" to the Robena deed stated:
Exhibit "A" to that certain Assignment from NBH Liquidating Trust to be effective January 1, 1992, pertaining to lands located in Jackson Parish, Louisiana.
*1166 Davis Brothers A-1 & C-1 E/2 Sec. 21 & W/2 Sec. 22, T-16-N, R-2-W McDowell SW/4 Sec. 2, SE/4 Sec. 3, NE/4 Sec. 10, NW/4 Sec. 11, all T-16-N, R-2-W Breedlove N/2 Sec. 3, T-16-N, R-2-W & S/2 Sec. 34, T-17-N, R-2-W Davis Brothers J-1 SE/4 Sec. 10, SW/4 Sec. 11, NW/4 Sec. 14, NE/4 Sec. 15, all T-16-N, R-2-W
This Exhibit "A" and the Deed and Assignment of Leases and Bill of Sale to which this Exhibit "A" is attached (the "Deed") only cover and include royalty interests, overriding royalty interests and fee mineral interests with respect to the lands, wells and other properties described above or otherwise described in the Deed.
On October 1, 1997, a "Certificate of Sale of Personal Property (Acquired by the United States Under Internal Revenue Law)" was recorded in Jackson Parish. It stated that on September 29, 1997, personal property acquired by the United States from Caroline Hunt under the provisions of Section 6.3 of the Joint Plan was sold to Wayne Pender and A.O. Milstead, Jr. A property description including the undivided 0.2323 mineral interest in the property was attached to the certificate.
On January 12, 1998, Caroline and her mother's estate conveyed their mineral interests in the property by quitclaim deed to Wayne Pender, Linda Blaylock Pender, Andrew Ordell Milstead, Jr., and Florentina Rodriguez Milstead. Dynex Royalties would acquire a mineral interest in the property through this chain of title.
On April 26, 2017, Compass Energy Operating, LLC, the operator of a unit that included the disputed property, filed a petition in concursus in Jackson Parish. Compass alleged there was a dispute over an undivided mineral interest in the property. Among the defendants named were Robena Property & Royalty Company, Ltd., Dynex Royalties, and the Milsteads.
Compass contended that because Exhibit A to the Pate deed did not list any mineral leases, unit names, or other assets associated with the property other than the reference to the McDowell well, then the extent of the interest in the property that was intended to be conveyed in the Pate deed was unclear.
The Milsteads filed a pretrial memorandum in which they asserted that: (1) La. R.S. 9:2092 required that the Agreement be recorded in Jackson Parish in order for the Trust to own immovable property there; (2) the omnibus property description in the Pate deed did not provide adequate notice to third parties who acquired an adverse interest; and (3) the Robena deed conveyed only producing wells. Dynex adopted this pretrial memorandum as its own.
*1167 At the trial in this matter, the court accepted into evidence various documents in the chain of title. Because the Joint Plan and bankruptcy order were not recorded in Jackson Parish, the trial court allowed them into evidence for the limited purpose of showing that a bankruptcy had been filed. After hearing argument from the parties, the trial court adopted the "argument and memorandum and citations of the law" in the Milsteads' pretrial memorandum. Accordingly, the trial court rendered judgment in favor of the Milsteads and Dynex and against Robena.
Robena has appealed.
DISCUSSION
We note from the outset that the ownership of the undivided mineral interest left to Caroline's mother by her father is not in dispute. Thus, the defendants who assert title through the Robena deed make no claim to this 0.140909 mineral interest which was obtained by Caroline following her mother's death in 1996. At issue is the ownership of the 0.08181 interest that Caroline received at the liquidation of Lewis Realty Corporation and from her father's succession.
Recordation requirement
Robena first argues on appeal that the trial court erred as a matter of law in adopting the Milsteads' argument that the Agreement needed to be recorded in Jackson Parish in order for third parties to be affected by any conveyances of immovable property in Jackson Parish in the Pate deed. Robena contends that because the Trust was created and the Hunts' property transferred to the trustee by operation of law upon the filing of the bankruptcy petition, the requirement that the Agreement be recorded in order to affect third parties was not applicable.
Mineral rights were conveyed in the various deeds. A mineral right is an incorporeal immovable. La. R.S. 31:18. La. R.S. 9:2092(A) mandates the recordation of a trust instrument when the trust includes immovable property:
If at any time the trust property of either an inter vivos trust or a testamentary trust includes immovables or other property the title to which must be recorded in order to affect third persons, a trustee shall file the trust instrument ... for record in each parish in which the property is located....
The Louisiana Trust Code contemplates two types of trusts: an inter vivos trust and a testamentary trust. However, the Trust in this matter is not a Louisiana statutory trust created under the Louisiana Trust Code. Rather, it was created under the authority of a United States bankruptcy court in Texas in order to administer the estate created under 11 U.S.C. § 541(a) when the Chapter 11 bankruptcy petition was filed. As such, the trustee was tasked with liquidating certain assets belonging to the Hunts and paying off creditors.
La. R.S. 9:1761 defines a settlor as the person who created the trust. A settlor may dispose of property in trust to the same extent that he may dispose of that property free of trust. La. R.S. 9:1737. The Trust was not created by the Hunts as settlors, but by order of the bankruptcy court. Upon filing their Chapter 11 bankruptcy petition and prior to the establishment of the Trust, the Hunts' bankruptcy estate was created. The estate included "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The Joint Plan was signed in November of 1989. The next month, the bankruptcy court confirmed the Joint Plan, approved the Agreement, and established the Trust. The bankruptcy court's order also stated that *1168 except for retained assets, all of the property in the Hunts' bankruptcy estate would vest in the trustee.
Finally, we recognize that the Pate deed clearly established from whence Pate's interest in the property originated. The deed contained specific language that it was being executed and recorded "merely to memorialize and to place of record, in conformance with applicable state law, the transfer of the Properties which occurred on January 8, 1990." Thus, this is not a situation where a third party examining the chain of title would be unable to determine how a trustee had obtained an interest in the property.
Under the circumstances of this case, we conclude there was no requirement that the Agreement be recorded in Jackson Parish in order for Pate, as trustee, to acquire immovable property in Jackson Parish through the Pate deed or for that conveyance to affect third parties. Accordingly, the trial court erred in determining otherwise.
Public records doctrine
Robena next argues that that the trial court erred in concluding that the Pate deed contained an omnibus description that did not provide adequate notice to third parties who acquired an adverse interest. Robena maintains that the property description was sufficiently specific to inform third parties of the properties conveyed therein.
As this court stated in Biggs v. Hatter , 46,910, pp. 12-13 (La. App. 2 Cir. 4/11/12), 91 So.3d 1148, 1157, writ denied , 2012-1075 (La. 9/21/12), 98 So.3d 337 :
The public records doctrine is founded upon our public policy and social purpose of assuring the stability of land titles. Camel v. Waller , 526 So.2d 1086 (La.1988). The doctrine does not create rights in a positive sense, but rather has the negative effect of denying the effectiveness of certain rights unless they are recorded. It is essentially a negative doctrine. Third persons are not allowed to rely on what is contained in the public records but can instead rely on the absence from the public record of those interests that are required to be recorded. Camel v. Waller , supra . Simply put, an instrument in writing affecting immovable property which is not recorded is null and void except between the parties. Cimarex Energy Co. v. Mauboules , 2009-1170 (La. 4/9/10), 40 So.3d 931.
The public records doctrine is reflected in La. C.C. art. 3338.
On the basis of the public records doctrine, third persons need only to look to the public records to determine adverse claims. All persons are held to have constructive notice of the existence and contents of recorded instruments affecting immovable property. Thomas v. Lewis , 475 So.2d 52 (La. App. 2 Cir. 1985).
Where a recorded instrument has language that fairly puts a third person on inquiry as to the title and he does not avail himself of the means and facilities at hand to obtain knowledge of the true facts, he is to be considered as having purchased at his own peril. Wells v. Joseph , 234 La. 780, 101 So.2d 667 (1958).
Louisiana jurisprudence has not established precise criteria to determine what description in the public records is sufficient to place third persons on notice, and such determination is to be made on a case-by-case basis. Quality Environmental Processes, Inc. v. I.P. Petroleum Co., Inc. , 2013-1582 (La. 5/7/14), 144 So.3d 1011. Louisiana courts have been liberal in construing the description of property in deeds so as to sustain, rather than defeat, the conveyance. Id.
The Milsteads and Dynex assert that the Pate deed contained an omnibus *1169 property description. An omnibus description does not provide adequate notice to third parties. Williams v. Bowie Lumber Co. , 214 La. 750, 38 So.2d 729 (1948).
The Milsteads and Dynex maintain that the Pate deed failed to adequately describe the property rights that were purportedly conveyed. They further maintain that the deed did not describe any mineral lease, and that nowhere on Exhibit A was there any description of any particular lease, particular mineral interest, or particular interest in future mineral production. They argue that the four wells were the only properties described with detail on Exhibit A.
Robena counters that the property description in the Pate deed did not limit the property conveyed to the wells listed in Exhibit A. Robena further argues that the lands burdened by the mineral servitude were specifically described.
The Pate deed described what was being conveyed from the Hunts to Pate as:
[T]he wells described on Exhibit "A"... and all mineral estates, mineral leases, oil and gas leases, oil, gas, hydrocarbons and mineral leases and other interests of any kind whatsoever in any mineral estate, together with all oil, gas and other minerals produced therefrom, whether known or unknown, ... and all royalty interests, overriding royalty interests, net profits interests, production payments and similar interests described in Exhibit "A", ... and each and every kind and character of right, title, claim, or interest which Grantors have in and to the interests, properties, and lands set forth on Exhibit "A"....
Exhibit A lists wells in one column and then various property descriptions in another column. Thus, to the right of the "McDowell" well is the property description of "SW/4 Sec. 2, SE/4 Sec. 3, NE/4 Sec. 10, NW/4 Sec. 11, all T-16-N, R-2-W." Within the SW/4 of Section 2 is the property at issue in this matter, namely the E/2 of SE/4 of SW/4 of Section 2 in T-16-N, R-2-W. Thus, Exhibit A clearly designates the property in which the Hunts conveyed "every kind and character of right, title, claim, or interest" to Pate, that being the property at issue.
The property description was sufficiently specific to place third parties on notice of what had been conveyed. Accordingly, the trial court was clearly wrong in adopting the Milsteads' argument that characterized the Pate deed as containing an omnibus description which failed to give adequate notice to third parties.
Remand
At the trial, the court considered ordering the case transferred to the bankruptcy court to rule on what had occurred in the bankruptcy proceeding. We remand this matter to the trial court to determine what relevant properties were transferred to the bankruptcy estate upon filing of the bankruptcy petition and subsequently conveyed to the trustee. This is especially prudent in light of the aforementioned "Certificate of Sale of Personal Property (Acquired by the United States Under Internal Revenue Law)" that was recorded in Jackson Parish five years after the Pate deed.
CONCLUSION
With the parties to bear their own costs, the judgment is REVERSED and the matter is REMANDED for further proceedings in accordance herewith.
APPLICATION FOR REHEARING
Before Felicia Toney Williams, Daniel Milton Moore III, Frances Jones Pitman, Jeff Cox, Jay Bowen McCallum - Writing, JJ.
Rehearing denied.