RENTON PROPERTIES, LLC

VERSUS

213 UPLAND, LLC

NO. 23-CA-479

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 775-357, DIVISION "C"
HONORABLE JUNE B. DARENSBURG, JUDGE PRESIDING

December 27, 2024

**JUDE G. GRAVOIS**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Jude G. Gravois, and Marc E. Johnson

**AFFIRMED IN PART; AMENDED IN PART; REVERSED IN PART**
**JGG**
**SMC**
**MEJ**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
RENTON PROPERTIES,LLC
     Patrick S. McGoey
     Andrea V. Timpa
     Robert L. Raymond

COUNSEL FOR DEFENDANT/APPELLEE-2ND APPELLANT,
213 UPLAND, LLC
     Thomas M. Flanagan
     Anders F. Holmgren
     Kansas M. Guidry

COUNSEL FOR DEFENDANT/APPELLANT,
MARGARET W. TONTI, ROBERT J. TONTI, AND OHIO MANAGEMENT,
LLC
     Jefferson R. Tillery
     Madeleine Fischer
     Jessica S. Allain

**GRAVOIS, J.**

Defendants/appellants, 213 Upland, LLC ("Upland"), Margaret Tonti, Robert J. Tonti, and Ohio Management, LLC, appeal the jury verdict rendered in favor of plaintiff/appellee, Renton Properties, LLC ("Renton"). For the reasons that follow, we affirm in part, amend in part, and reverse in part. We affirm the jury verdict finding that Upland breached its contract with Renton. We reverse the jury verdict finding that Upland breached the contract with Renton in bad faith. We reverse the jury verdict and judgment against Mrs. Tonti, Mr. Tonti, and Ohio Management. We amend and reduce the jury award of damages in favor of Renton against Upland from $2,067,400.00 to the stipulated damages amount of $20,000.00, plus legal interest thereon from the date of judicial demand until paid. We affirm the award of attorney's fees and costs to Renton as follows: attorney's fees in the amount of $233,703.00, plus legal interest thereon from February 17, 2023 until paid; expert witness fees in the amount of $26,683.33; deposition costs in the amount of $2,949.15; and court costs in the amount of $18,324.61. Finally, we reverse the treble damages award to Renton.

## FACTS AND PROCEDURAL HISTORY

Margaret Tonti is the owner and sole member/manager of 213 Upland, LLC ("Upland"). In 2017, Mrs. Tonti decided to sell Upland's only asset: approximately four acres of land located at 213 Upland Avenue in River Ridge, Louisiana. Mrs. Tonti asked her son, Robert Tonti, to help her sell the property, and she gave him full authority to act on her behalf. Real estate agents Mary "Meg" Carrone and Emily Kramer with Corporate Realty Leasing Company, Inc., listed the property for sale.

On August 10, 2017, Renton Properties, LLC ("Renton") tendered an offer to purchase the property for the sum of $365,000.00 (the "Renton Agreement").[1] Renton's offer stated: "Upon acceptance of this offer, SELLER and PURCHASER shall be bound by all of its terms and conditions and PURCHASER becomes obligated to deposit *immediately* with Seller's agent $10,000.00 and failure to do so *shall be considered a breach of this agreement*." (Emphasis added.) The offer provided for a 90-day due diligence period, followed by a closing within 30 days. Mr. Renton intended to build 16 buildings consisting of 32 townhomes on the property.

On August 14, 2017, Upland responded to Renton's offer with a counter-offer of $425,000.00 and a deposit of $20,000.00. Renton accepted the counter-offer on Thursday, August 17, 2017. Renton's real estate agent, Charles Mullin, emailed the signed counter-offer to Ms. Carrone and Ms. Kramer at 2:19 p.m. and asked: "Should the deposit check be made to 'Corporate Realty Sales Escrow Account' and sent to your offices at 201 St. Charles Avenue? Please advise." Ms. Carrone responded by email at 3:22 p.m. stating: "The check should be made to Corporate Realty and you can send it to Emily's attention at 201 St. Charles."

Mr. Mullin forwarded the email to Mr. Renton at 5:05 p.m. Mr. Renton received the email while out with clients. Mr. Mullin and Mr. Renton spoke on the telephone sometime later that evening and discussed the matter. Because Mr. Renton would be in Port Fourchon the next day, Friday, August 18, 2017, and in Kentucky on Monday, August 21, 2017, Mr. Mullin and Mr. Renton agreed that Mr. Renton would sign the $20,000.00 deposit check over the weekend. Mr. Mullin would pick the check up from Mr. Renton's office and deliver the check to Corporate Realty on Monday morning. Mr. Renton testified that he printed and

---

[1] Renton is owned by Edward Renton, Jr.

signed the check on Sunday, August 20, 2017, and left it taped to the front window in the reception area of his business located in Kenner, Louisiana.

On Friday, August 18, 2017, Mr. Mullin emailed Ms. Carrone and Ms. Kramer, requesting permission to "begin filling the site" with sand. The request was denied. Neither party discussed the pending deposit on this day.

Meanwhile, during this time, on August 15, 2017, another party, Charles R. Cannon, III, put in an offer to purchase the property for $500,000.00 with a 15-day due diligence period and a closing within 5 days (the "Cannon Agreement"). On August 17, 2017, Upland responded with a counter-offer, adding solely that the purchase agreement is "subject to termination of the Purchase Agreement with Counter signature of today's date and presently in effect between Seller and third party purchaser [Renton]." Mr. Cannon returned the executed counter-offer on Friday, August 18, 2017.

At approximately 8:00 a.m. on Monday, August 21, 2017, Ms. Kramer was at her office at Corporate Realty when she discovered that Renton had not yet furnished the $20,000.00 deposit. She called both Ms. Carrone and Mr. Tonti. Mr. Tonti advised her to contact Upland's attorney, R. Lewis McHenry, for a legal opinion since it "sound[ed] like its null and void."

At 9:09 a.m., Lori Marshall, Mr. McHenry's legal secretary, emailed a letter to Mr. Mullin from Mr. McHenry, which stated:

> Our Firm represents Mrs. Margaret W. Tonti and 213 Upland, LLC, the owner of 213 Upland Avenue, River Ridge, Jefferson Parish, Louisiana. This will advise you that the Owner did not receive the Deposit when the signed counteroffer was delivered to Owner's Broker, in contravention of the Purchase Agreement. The Purchase Agreement requires the Deposit to be delivered "immediately" and "failure to do so shall be considered a breach of this agreement." Accordingly, the Purchase Agreement is null and void and without any force or effect.

After receiving the letter, Mr. Mullin attempted to hand-deliver the $20,000.00 deposit check to Ms. Kramer at Corporate Realty. There, he met with

Ms. Kramer who informed him that she could not accept the check on the advice of her client, Mr. Tonti, and Mr. McHenry. At trial, Mr. Tonti testified that he advised Ms. Kramer not to accept the deposit check on Monday based on Mr. McHenry's advice. At that point, he understood the Renton Agreement was terminated based on Mr. McHenry's legal counsel, and thus, he could do anything he wanted to do with the property.

Thereafter, Mr. Mullin contacted Renton's attorney, Patrick McGoey. On Monday afternoon, Mr. McGoey began discussing the alleged nullity and enforceability of the Renton Agreement with Mr. McHenry. Mr. McGoey testified that he disagreed with Mr. McHenry's interpretation that the Renton Agreement was null and void and shared law he found concerning the matter. Both lawyers agreed they needed to resolve the matter short of litigation. On Wednesday, August 23, 2017, Mr. McGoey responded to a proposal by Mr. McHenry and informed him that Renton would not agree to pay an increased purchase price for the property, but would agree to shorten the due diligence period. However, if the parties could not agree by Friday, August 25, 2017, Mr. McGoey indicated that he would file a lawsuit and a notice of *lis pendens*. Mr. McHenry told Mr. McGoey he would speak with his client and get back to Mr. McGoey. Mr. McGoey testified that he never heard back from Mr. McHenry.[2] On Friday, August 25, 2017, at 1:06 p.m., Renton filed a petition naming Upland as a defendant and seeking specific performance, or alternatively, damages and injunctive relief.

---

[2] On Thursday, Ms. Marshall, Mr. McHenry's secretary, called Mr. McGoey to inform him that Mr. McHenry was busy and would call him back later. Mr. McGoey testified that Mr. McHenry never called him back.

Meanwhile, on the afternoon of Monday, August 21, 2017, Mr. Tonti emailed Ms. Kramer and Ms. Carrone a "signed Cannon purchase agreement."[3] He asked that they contact Mr. Cannon's agent, Duff Friend, and inform him that:

> … [O]n advice of counsel we feel the purchase agreement with Mr. Renton is null and void. Mr. Renton is not happy about it but we are moving on to Mr. Cannon's Offer/Purchase agreement. Please have Duff delivery [sic] deposit asap to Corp. Realty.

Mr. Cannon subsequently dropped off the deposit check at Corporate Realty. Mr. Friend emailed the agents on Monday afternoon to confirm that the due diligence period would expire on September 5, 2017 and the closing would take place on September 11, 2017.

On Wednesday, August 23, 2017, Mr. Friend emailed Ms. Carrone and Ms. Kramer to inform them that Mr. Cannon wished to close the sale on Friday morning. Danya Duffy at Acquisition Title served as the closing attorney. She testified that Mr. Cannon wanted the closing done as soon as possible. As part of the closing, she was given the purchase agreement signed on Monday, August 21, 2017; it did not include the previous counter-offer language. She testified that had she been given the counter-offer, she would have "done something," including asking Upland questions about why the Renton Agreement was terminated. Depending on the answers, she may have delayed the closing.[4]

The cash sale of the property to JodyCorp, LLC[5] for $500,000.00 occurred on Friday, August 25, 2017. Mr. McHenry's legal secretary, Robin Riviere,

---

[3] It was established at trial that Mr. Tonti re-signed the original Cannon offer on Monday, August 21, 2017, which did not include the previous counter-offer language concerning termination of the Renton Agreement.

[4] Both Ms. Kramer and Mr. Tonti testified regarding getting the sale done quickly. In an email on Friday morning, Ms. Kramer wrote to Traci Daigre at Acquisition Title: "Traci, everyone's told you how imperative it is to file the sale immediately?" Ms. Kramer testified that it was her understanding that Mr. Tonti was aware that a lawsuit regarding the Renton Agreement was coming, so he was happy to get the closing done soon. Mr. Tonti testified it was in his mother's best interest to close on the sale on Friday because of the pending lawsuit.

[5] JodyCorp, LLC is a limited liability company that was formed by Charles Cannon.

traveled to Mrs. Tonti in St. Tammany Parish and witnessed her sign the cash sale.[6] At the time, Mrs. Tonti also signed a letter authorizing that the sale proceeds be wired to the account of Ohio Management, LLC – another company owned by Mrs. Tonti.[7] The sale was recorded the same day at 12:01 p.m.[8]

In Renton's petition, filed at 1:06 p.m. on the same day, Renton claimed that Upland breached its obligation by refusing to accept its deposit and by attempting to declare the contract null and void. Renton asserted it is entitled to damages in the sum of $20,000.00, plus attorney's fees and all costs. On February 6, 2018, Renton filed its First Amended and Supplemental Verified Petition naming ten additional defendants: Mrs. Tonti, Mr. Tonti, Ohio Management, Corporate Realty, Ms. Carrone, Ms. Kramer, Mr. Cannon, JodyCorp, Mr. Friend, and Mr. McHenry. In its amended petition, Renton alleged, in addition to seeking specific performance, that defendants breached the Renton Agreement, were negligent, committed fraud, and participated in unfair trade practices in violation of the Louisiana Unfair Trade Practices Act ("LUTPA"), La. R.S. 51:1401, *et seq.*[9]

Prior to trial, Renton dropped its negligence claim. All claims against Mr. McHenry were dismissed after this Court reversed the trial court's judgment denying his motion for summary judgment. *See Renton Properties, LLC v. 213 Upland, LLC*, 20-133 (La. App. 5 Cir. 10/5/20), 304 So.3d 1083, *writ denied*, 20-01395 (La. 1/26/21), 309 So.3d 345. Renton also settled with all but the following defendants: Upland, Mrs. Tonti, Mr. Tonti, and Ohio Management.

---

[6] The act of sale was notarized by Mr. McHenry, and Ms. Marshall signed the act of sale as a witness. Both Ms. Riviere and Ms. Marshall testified that Mr. McHenry and Ms. Marshall were not physically present when the act of sale was signed by Mrs. Tonti.

[7] Mrs. Tonti testified that she is the sole owner of Ohio Management, the company that runs Tonti Apartments. In 2017, Mr. Tonti became a co-manager of Ohio Management.

[8] In an email exchange following the sale, Ms. Kramer wrote to Mr. Tonti and Ms. Carrone: "How do we know they beat the *lis pendens* filing? Would Lewis be able to find out?" Ms. Kramer then emailed Mr. McHenry to ask if he knew if they beat the *lis pendens*. At trial, Ms. Kramer did not deny sending those emails.

[9] Several cross-claims were also filed.

A five-day jury trial ensued from August 8–12, 2022. Renton called the following witnesses: Mr. Renton; Mr. Mullin; Mrs. Tonti; Ms. Kramer; Ms. Duffy; Dr. Rodolfo Aguilar, an expert in the field of appraisals, performing valuation services while not acting as an appraiser; Stephen Dwyer, an expert in real estate transactions; Ms. Marshall, Ms. Riviere, Mr. Tonti, and Mr. McGoey. Defendants called the following witnesses: David Vercher, an expert in commercial real estate; Randy Opotowsky, an expert in the field of real estate law; and Baldwin Richard Justice, an expert in real estate appraisals.

On August 12, 2022, the jury rendered the following verdict:

1. **Did Renton Properties, LLC prove by a preponderance of the evidence that 213 Upland, LLC breached the contract?**

   **Yes __X___  No ___**

   If you answered yes, please proceed to question 2. If you answered no, please skip question 2 and go to question 3.

2. **Did Renton Properties, LLC prove by a preponderance of the evidence that 213 Upland, LLC breached the contract in bad faith?**

   **Yes __X___  No ___**

   Please proceed to question 3.

3. **Did 213 Upland, LLC prove by a preponderance of the evidence that Renton Properties, LLC breached the contract?**

   **Yes ___  No __X___**

   If you answered yes to question 1, regardless of your answers to questions 2 and 3, please proceed to question 4. If you answer no to question 1, regardless of your answer to question 3 please do not answer any more questions. Please skip all further questions, sign and date this form and return to the courtroom.

4. **Did Renton Properties, LLC prove by a preponderance of the evidence that any of the defendants committed fraud that caused damages to it?**

   **Yes __X___  No ___**

   Please proceed to question 5.

5. **Did Renton Properties, LLC prove by a preponderance of the evidence that any of the defendants committed an act or practice which constitutes an unfair trade practice under the Louisiana**

**Unfair Trade Practices and Consumer Protection Act that caused damages to it?**

Yes __X___   No ___

If you answered yes to either questions 4 or 5, please proceed to question 6. If you answered no to both 4 and 5, please skip questions 6 and 7 and proceed to question 8.

6. **Do you find that the plaintiff, Renton Properties, LLC, proved by a preponderance of the evidence that defendant, 213 Upland, LLC, is the alter ego of Margaret W. Tonti, such that Margaret W. Tonti is personally liable for the debts, obligations, and liabilities owed by 213 Upland, LLC?**

Yes ___   No __X___

Please proceed to question 7.

7. **Do you find that the plaintiff, Renton Properties, LLC, proved by a preponderance of the evidence that defendant, Ohio Management, LLC, is the alter ego of either Margaret W. Tonti or Robert J. Tonti, such that Margaret W. Tonti and/or Robert J. Tonti is personally liable for the debts, obligations, and liabilities owed by Ohio Management, LLC? Answer separately for each person.**

**Margaret W. Tonti**     Yes __X___   No ___

**Robert J. Tonti**        Yes __X___   No ___

Please proceed to question 8.

8. **Allocate the percentage of fault that caused damage to Renton Properties among all actors in this case, with the percentages totaling 100%. If you do not find any fault, or if you do not find that any fault caused damage to Renton Properties you may enter 0.**

| | |
|---|---|
| __0__ % Ed Renton | _0__ % JodyCorp, LLC |
| __0__ % 213 Upland, LLC | _0__ % Charles Cannon |
| __0__ % Ohio Management, LLC | _0__ % Duff Friend |
| __5__ % Margaret Tonti | _10_ % Corporate Realty, LLC |
| __85_ % Robert Tonti | _0__ % Mary "Meg" Carrone |
| | _0__ % Emily Kramer |

Please proceed to question 9.

9. **What is the total amount of actual damages, if any, sustained by Renton Properties, LLC? If you find that Renton Properties, LLC failed to mitigate its damages, you should reduce the total by the amount Renton could have mitigated.**

**$_2,067,400.00____**

Please proceed to question 10.

**10. Do you find that the Purchase Agreement limited by contract the amount that Renton Properties, LLC could recover as damages to twice the amount of the deposit?**

**Yes ___ No __X___**

On September 7, 2022, the trial court signed a written judgment in accordance with the jury verdict. The judgment states the following:

- Upland breached its contract with Renton;

- Upland breach its contract with Renton in bad faith;

- Renton did not breach its contract with Upland;

- Upland, Mrs. Tonti, Mr. Tonti, and Ohio Management committed fraud that caused damages to Renton;

- Upland, Mrs. Tonti, Mr. Tonti, and Ohio Management committed an act or practice which constitutes an unfair trade practice that caused damages to Renton;

- Upland is not the alter ego of Mrs. Tonti, and Mrs. Tonti is not personally liable for Upland's debts, obligations, and liabilities;

- Ohio Management is the alter ego of Mrs. Tonti and Mr. Tonti, and they are personally liable for Ohio Management's debts, obligations, and liabilities;

- The allocation of fault is 5% to Mrs. Tonti, 85% to Mr. Tonti, and 10% to Corporate Realty;

- Renton sustained damages in the amount of $2,067,400.00 with legal interest from date of judicial demand;

- The purchase agreement did not limit the amount that Renton could recover as damages to twice the amount of the deposit; and

- The amount of attorney's fees and costs to be awarded shall be heard and determined by the Court upon the filing of a motion. The Court shall also determine, by motion, the amount of treble damages, if any, that Renton is entitled to recover pursuant to LUTPA. The Court shall also hear and determine any other post-judgment motions filed by the parties.

Thereafter both Renton and defendants filed motions for judgment notwithstanding the verdict ("JNOV"). On November 3, 2022, Renton also filed a motion for treble damages and a motion for attorney's fees and costs. These post-

23-CA-479                                    9

trial matters were heard by the trial court on January 13, 2023. A written judgment was signed on February 17, 2023, wherein the trial court denied Renton's JNOV and defendants' JNOV, granted Renton's motion for treble damages, and granted Renton's motion for attorney's fees and costs. The trial court found that Renton shall be awarded $233,703.00 in attorney's fees; expert fees in the amount of $26,683.33; deposition costs in the amount of $2,949.15; and court costs in the amount of $18,324.61.

Renton moved to amend the February 17, 2023 judgment, arguing that it did not contain the proper decretal language. On April 19, 2023, the trial court granted the motion and amended the final judgment in the following particulars:

- There will be a 10% reduction in the portion of Renton's damages allotted by the jury to defendants in light of the jury's allocation of 10% fault to Corporate Realty;

- Judgment is rendered in favor of Renton against Mrs. Tonti, Upland, and Ohio Management solidarily for 5% of Renton's actual damages in the amount of $103,370.00 from date of judicial demand – which date is August 25, 2017 for Upland and February 6, 2018 for Mrs. Tonti and Ohio Management;

- Judgment is rendered in favor of Renton against Mrs. Tonti, Upland, and Ohio Management solidarily for any additional penalty under LUTPA for $206,740.00 with judicial interest from February 17, 2023;

- Judgment is rendered in favor of Renton against Mr. Tonti, Upland, and Ohio Management solidarily for 85% of Renton's actual damages in the amount of $1,757,290.00 with judicial interest from the date of judicial demand – which date is August 25, 2017 for Upland and February 6, 2018 for Mr. Tonti and Ohio Management;

- Judgment is rendered in favor of Renton against Mr. Tonti, Upland, and Ohio Management solidarily for an additional penalty under LUTPA in the amount of $3,514,580.00 with judicial interest from February 17, 2023;

- Judgment is rendered in favor of Renton against Upland, Mrs. Tonti, Mr. Tonti, and Ohio Management solidarily for attorney's fees in the amount of $233,703.00 with judicial interest from February 17, 2023; and

- Judgment in favor of Renton against Upland, Mrs. Tonti, Mr. Tonti and Ohio Management solidarily for $2,949.15 in deposition fees,

$26,683.33 in expert costs; and $18,324.61 in court costs, all without judicial interest.

Upland appealed, arguing the following assignments of error:

1. Pervasive errors prejudiced Upland and interdicted the jury's findings on key issues.

2. Upland did not breach the agreement; Renton failed to deliver the deposit "immediately" and lost the right to buy the property.

3. Even if Upland breached the purchase agreement, the stipulated damages clause caps all damages.

4. Lost profits must be proven with reasonable certainty; over $2 million for speculative damages is unjustifiable.

5. The LUTPA award has both procedural and substantive errors.

Mrs. Tonti, Mr. Tonti, and Ohio Management raise the following assignments of error on appeal:

1. The true nature of Renton's claims is one for tortious interference with a contract which can only be brought against corporate officers; thus, the case should be dismissed.

2. The trial court erred in denying Mrs. Tonti and Mr. Tonti's motions for summary judgment and by entering judgment against Mrs. Tonti and Mr. Tonti for actions taken on behalf of an LLC.

3. The trial court erred in denying Mrs. Tonti and Mr. Tonti's motions for summary judgment and JNOV and entering a judgment against them on the fraud and LUTPA claims.

4. The trial court erred in casting Ohio Management in judgment when the jury found Ohio Management free from fault and assigned it zero percent.

5. Defendants adopt all assignments of error made by Upland.

Renton filed an answer to the appeal and assigns the following as errors:

1. The trial court erred by including all settled parties on the jury verdict form and instructing the jury to allocate fault among all parties.

2. The trial court erred by reducing Renton's award by 10% for the fault allotted to Corporate Realty.

3. The trial court erred by holding Mrs. Tonti and Mr. Tonti solidarily liable for 100% of Renton's actual and treble damages, attorney fees and costs and failing to hold Upland liable for 100% of Renton's actual damages, attorney's fees and cost for breach and bad faith breach of contract.

4. The trial court erred in failing to grant Renton's JNOV and finding that Upland was Mrs. Tonti's alter ego.

5. Renton should be entitled to attorney's fees and costs in this appeal.

## LAW AND ANALYSIS

## UPLAND'S ASSIGNMENT OF ERROR NUMBER ONE

### *Did legal errors interdict the jury's fact-finding function?*

In its first assignment of error, Upland argues two legal errors interdicted the jury's fact-finding function, thus triggering a *de novo* review of the record. Specifically, Upland contends Mr. McHenry was dismissed from the case after this Court granted his motion for summary judgment. Under La. C.C.P. art. 966(G), Renton could not then try to prove that Mr. McHenry was at fault. Upland argues the trial court failed to enforce this when it allowed Renton to discuss Mr. McHenry in its closing argument. Upland also argues the trial court erred when it allowed Mr. McGoey, a lay witness, to testify regarding his legal expertise and to testify on Louisiana law.

A reviewing court may not set aside a trial court or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." *Hicks v. USAA Gen. Indem. Co.*, 21-840 (La. 3/25/22), 339 So.3d 1106, 1115, *reh'g denied*, 21-840 (La. 5/10/22), 347 So.3d 735, citing *Evans v. Lungrin*, 97-541 (La. 2/6/98), 708 So.2d 731, 735. However, where the trial court makes a legal error that interdicts the fact-finding process, the manifest error standard is no longer applicable, and the appellate court may conduct a *de novo* review of the record. *Id.* A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. *Id.* Errors are prejudicial when they materially affect the outcome of the trial and deprive a party of substantial rights. *Id.* A *de novo* review should be limited to consequential errors, which are those that have prejudiced or tainted the verdict rendered. *Succession of Gendron*, 21-14 (La. App. 5 Cir. 6/23/21), 325 So.3d 584, 594, *writ denied*, 21-1075 (La. 11/23/21), 328 So.3d 79. When such a prejudicial error of law skews the trial court's finding of a material

issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts *de novo*. *Hicks*, *supra*.

### *References to Mr. McHenry during Renton's closing argument*

As to the first alleged error, Upland argues Renton violated La. C.C.P. art. 966(G) when it referenced Mr. McHenry in its closing argument.

When a party is dismissed by summary judgment, La. C.C.P. art. 966(G) prohibits the dismissed party from being considered in any subsequent allocation of fault, prohibits the admission of any evidence at trial to establish the fault of the dismissed party, and prohibits direct or indirect reference to the fault of the dismissed party at trial. This article serves to prohibit the shift of liability from a defendant who is currently involved in litigation to another party who was previously involved in litigation, but was dismissed by summary judgment. *Detillieu v. Louisiana Med. Mut. Ins. Co.*, 23-226 (La. App. 5 Cir. 7/9/24), 392 So.3d 918, 932, citing *Amedee v. Aimbridge Hospitality LLC*, 21-1906 (La. 10/21/22), 351 So.3d 321, 322. In *Amedee*, the Louisiana Supreme Court deduced that with the addition of the language prohibiting reference to a dismissed party, "the legislature intended to prevent potential jury confusion by expressly prohibiting references to a dismissed defendant whose fault would never actually be presented to the jury." *Id.* at 334.

Mr. McHenry filed a motion for summary judgment, arguing that Renton could not prove that he was a party to the allegedly breached contract, that he owed any duty of care to Renton, or that he made any false misrepresentations. The motion was denied by the trial court, but on supervisory review, this Court granted Mr. McHenry's writ application, reversed the trial court's judgment, and rendered judgment in favor of Mr. McHenry, dismissing all of Renton's claims against him, with prejudice. In doing so, this Court found:

In summary, Renton has presented no evidence showing that a genuine issue of material fact exist[s] and/or that it will be able to carry its burden of proving at trial that McHenry can be held personally liable for breach of the Renton Agreement to which he was not a party; that McHenry can be personally liable to Renton for malpractice or breach of a professional obligation; that McHenry acted with specific malice or with an intent to personally cause Renton harm for which he can be held personally accountable for an intentional tort; that McHenry owed any duty to Renton or its counsel to disclose information regarding Upland's confidential business dealings, or made any affirmative misrepresentations to Renton or its counsel, during negotiations to resolve the dispute between Renton and Upland that rise to the level of fraud; or, that McHenry's alleged actions on behalf of his client fall under the protection of LUTPA.

*Renton Properties, LLC*, 304 So.3d at 1096-97.

On August 1, 2022, the trial court granted defendants' motion *in limine* to exclude direct and indirect testimony and evidence regarding any fault on the part of Mr. McHenry. In its oral reasons for judgment, the trial court stated it agreed that no direct or indirect reference to the fault of Mr. McHenry should be discussed, but did not find that to mean all discussions of Mr. McHenry were to be excluded, as that would prevent presenting the "full picture."

During closing argument, Renton stated the following:

So, let's, let's do our own little acronym. Let's say L. L is for Lewis McHenry. There was no basis, no basis, and we can look at PL33, please, there was no basis for Lewis' statement that a late deposit check made the contract null and void. You see where he says in the bottom line null and void? We just went through that agreement. And null and void is, in fact, in the agreement. But it's used at other locations relative to due diligence and relative to the merchantability of title. Compare and contrast that to the language that we've seen 100 times about the breach of the failure to post a deposit.

He cites it here: The purchase agreement requires a deposit to be delivered immediately, and failure to do shall be considered a breach of the agreement. That's our point. It's a breach. It's not null and void. The breach can be fixed. A breach can be fixed. Now, where was this, Mr. McHenry? Have y'all see him? He hasn't been around here. He didn't testify. He could have paid his lawyer of 30 years to come here and testify. I'll leave it to you to figure out why he wasn't here. He didn't come explain himself. And I'm not sure he would have an explanation.

Defendants objected, and a bench conference immediately followed, where defendants requested that a cautionary instruction be given on Mr. McHenry's presence at trial. The trial court judge told defendants that the issue could be addressed in their closing argument. In their closing argument, defendants informed the jury that Mr. McHenry was sued and this Court found that he "did nothing wrong" and was not at fault.

The following jury instruction was also presented to the jury:

> In the course of this trial, you have heard R. Lewis McHenry discussed. The Louisiana Fifth Circuit Court of Appeal has made factual findings with respect to R. Lewis McHenry and dismissed him from this suit. No fault may be assessed to R. Lewis McHenry.

Upon review, considering defendants' clarification in their closing argument and the jury instruction that Mr. McHenry was found free of fault, we find that any error by Renton in its discussion of Mr. McHenry during its closing argument did not taint the jury such that a *de novo* review is warranted.

### Testimony by Mr. McGoey, a lay witness, as to his legal expertise and his opinions as to the law

Upland also argues the trial court erred when it allowed Renton to allude to Mr. McGoey's legal expertise, education, and credentials during his trial testimony as a lay witness. Further, Upland argues the trial court erred in allowing Mr. McGoey to testify regarding *Membreno v. Ponder*, 417 So.2d 1257 (La. App. 1 Cir.), *rehearing denied*, 8/24/82, *writ denied*, 423 So.2d 1146 (La. 1982), and regarding his legal position relative to the breach of the purchase agreement in this case.

Mr. McGoey testified at trial as a lay witness. Louisiana Code of Evidence article 701 allows a lay witness to provide opinion testimony if it is: (1) rationally based on the perception of the witness; and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue. Also, this Court has recognized that where an attorney is proffered to the trial court as an expert in a

particular area of law, various Louisiana Courts of Appeal, including this Circuit, have adopted a jurisprudential rule that experts may not provide opinions regarding domestic (*i.e.*, Louisiana) law. *Par. of Jefferson v. Hous. Auth. of Jefferson Par.*, 17-272 (La. App. 5 Cir. 12/13/17), 234 So.3d 207, 212.

The question of whether Article 701 was violated is a determination within the discretion of the trial court. *Thompson ex rel. Hernandez v. Bellow*, 07-591 (La. App. 5 Cir. 2/6/08), 979 So.2d 531, 535. Also, a trial court has wide discretion concerning the admissibility and relevancy of evidence, and a trial court's ruling will not be disturbed on appeal absent a clear abuse of discretion. *Succession of Gendron*, 325 So.3d at 595. The reviewing court must consider whether the complained-of ruling was erroneous and whether the error affected a substantial right of the complaining party. *Id.* If a party's substantial right was not affected by an evidentiary ruling, reversal is not warranted. The complainant has the burden of proof. *Id.*

During trial, Mr. McGoey testified as to his conversations with Mr. McHenry following receipt of Mr. McHenry's letter.[10] Mr. McGoey reviewed the purchase agreement and disagreed with Mr. McHenry's interpretation that it was null and void since nothing in the deposit provision says the contract would be null and void if the deposit was not paid immediately. He informed Mr. McHenry of his "legal theory" which was "summed up" in the Louisiana Practice Series: Louisiana Real Estate Transactions, § 9:48, which was admitted into evidence over the objection of Upland. Mr. McGoey explained that according to the practice series, a failure to pay a deposit will not void a purchase agreement and a seller cannot refuse to deliver title on the grounds that the purchaser failed to make the

---

[10] Prior to Mr. McGoey testifying, defendants moved to bar his testimony. The trial court denied their request and allowed him to testify as to what his mindset was, but not what he thought Mr. McHenry was thinking or what Mr. McHenry told him.

required deposit. Mr. McGoey testified the court in *Membreno* found that even if a purchase agreement is found to be null and void due to failure to timely pay a deposit, the seller still had to give the purchaser a reasonable amount of time to timely pay the deposit.

Upon review, we find the trial court erred in allowing Mr. McGoey to opine on Louisiana law. Further, though he was discussing the facts surrounding what occurred once he received Mr. McHenry's letter, we find his testimony as a lay witness went beyond being "helpful to a clear understanding of his testimony." *See Thompson*, 979 So.2d at 535. Nonetheless, throughout the trial, other witnesses testified as to the breach of the Renton Agreement and the effect of the breach. Accordingly, we do not find that Upland has shown that Mr. McGoey's testimony prejudiced or tainted the jury verdict such that a *de novo* review is warranted.

## UPLAND'S ASSIGNMENT OF ERROR NUMBER TWO

### *Did the jury manifestly err in its determination of the meaning of "immediately"?*

In its second assignment of error, Upland argues it did not breach the purchase agreement. Instead, Renton failed to deliver the deposit "immediately," and therefore, Renton lost its right to buy the property. Nonetheless, Upland argues it did not act in bad faith since it acted upon a reasonable belief based on its counsel's advice that Renton failed to tender the deposit immediately and the purchase agreement was null and void.

In a motion for summary judgment filed by defendants, they argued Renton failed to immediately tender the deposit required by the contract, and in failing to perform this suspensive condition, no contract was ever perfected. The trial court denied the motion for summary judgment, and Upland sought supervisory review of the judgment. On May 6, 2022, this Court denied the writ application. This

Court found that the term "immediately" has been subject to different meanings, depending on the circumstances of the case, and whether or not Renton's attempted delivery of the deposit "less than two full business days after Renton accepted the counteroffer" was "immediate" as stated in the purchase agreement was a material issue of fact in dispute. *See Renton Properties v. 213 Upland*, *LLC*, 22-87 (La. App 5 Cir. 5/06/22) (unpublished writ disposition).

The Renton Agreement, entered into evidence, does not define the term "immediately." As Upland asserts, it does emphasize timeliness, noting "time is of the essence" and "all deadlines are final except where modifications, changes, or extensions are made in writing and signed by all parties to this agreement."

At trial, Mr. Renton testified that once the Renton Agreement was signed on Thursday afternoon, he was unsure as to whom to make the deposit check payable. Mr. Mullin inquired and upon receipt of the answer, forwarded Mr. Renton the email response he had received from Ms. Carrone. Mr. Renton was not at his office when he received the email. He later spoke with Mr. Mullin and they agreed that, because Mr. Renton was traveling to Port Fourchon on Friday and to Kentucky on Monday, Mr. Renton would leave the check at his office over the weekend for Mr. Mullin to pick up and deliver on Monday.

Mr. Mullin testified that he spoke with Mr. Renton on Thursday evening to inquire when Mr. Renton would "cut the check." They settled on Mr. Mullin picking up the check from Mr. Renton's office on Monday morning. As a real estate agent, he testified that "immediately" meant within a reasonable amount of time that is customary in New Orleans commercial marketplace transactions. He believed one to five days was a normal amount of time, and in this case, the check was delivered in less than two business days. He admitted there was no effort to deliver the check sooner, but he thought they were responding properly to Ms. Carrone's instructions.

Stephen Dwyer, a lawyer who primarily deals with real estate transactions, testified as an expert for Renton in real estate transactions. In his opinion, "immediately" in such a contract would have the meaning of "a reasonable time frame within the facts and circumstances surrounding the transaction." In his opinion, delivering the deposit on Monday was reasonable given the facts and circumstances of this case, specifically that the purchase agreement was signed on Thursday afternoon, and there was an intervening weekend. He testified it is rare to get a deposit at the same time you sign a purchase agreement.

The jury also heard testimony from Ms. Kramer, Upland's real estate agent, who stated that, in her opinion, immediately meant Thursday or Friday in this case, and Ms. Duffy, the closing attorney, who testified that in her opinion, immediately meant soon or the same day. Both witnesses testified that deposits are important in real estate transactions.

David Vercher testified for defendants as an expert in commercial real estate. He opined that immediately means "at once, promptly" and needs to be reasonable by industry standards.[11] In this case, in his opinion, the deposit was not delivered immediately. Since both parties were in the same town, Thursday would have been acceptable here, and the deposit was offered too late.

Randy Opotowsky, an expert in the field of real estate law, testified for defendants. In his opinion, "immediately" means right now and without delay, and the failure to pay the deposit that Thursday, or on Friday at the latest, was a breach of the agreement. He is not aware that two or three business days was customary in New Orleans.

---

[11] Because Mr. Vercher does not practice real estate law in New Orleans, he stated he cannot say whether he does or does not know the standard for what "immediately" means in the New Orleans real estate industry.

As noted, a court of appeal may not set aside a trial court or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." *Hicks*, 339 So.3d at 1115. To reverse a fact-finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and that the record establishes that the finding is clearly wrong. *Mart v. Hill*, 505 So.2d 1120 (La. 1987). Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations and inferences are more reasonable. *Antill v. State Farm Mut. Ins. Co.*, 20-131 (La. App. 5 Cir. 12/2/20), 308 So.3d 388, 401. Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be manifestly erroneous or clearly wrong. *Id.* While an appellate court must review the trial court's conclusions in light of the entire record, it "must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently." *Menard v. Lafayette Ins. Co.*, 09-1869 (La. 3/16/10), 31 So.3d 996, 1007.

Here, the jury was presented with two permissible views of the evidence, including expert testimony with different opinions. We find the jury was reasonable in its choice between the two opinions and find no manifest error in the jury's determination that Renton did deliver the check "immediately" under the circumstances of the case. Therefore, Renton did not breach the agreement when it attempted to deliver the deposit on Monday, and Upland did breach the agreement when it failed to accept Renton's deposit.

### *Did Upland breach the agreement in bad faith?*

Upland argues that even if it is found to have breached the agreement, the jury erred in finding it breached the contract in bad faith. Upland asserts it acted with the reasonable belief, based on counsel's advice, that Renton breached the

agreement by failing to timely pay the deposit. Upland argues that it could not be in bad faith when even this Court noted that "immediately" has different meanings.

Renton asserts that Upland knew by the terms of the contact that not immediately paying the deposit was a breach of the contract, but did not render it null and void; nonetheless, it still went forward with the sale to Cannon. Renton argues that Upland knew it intended to file suit for *lis pendens* and it intentionally accelerated the sale to Cannon.

Contracts in Louisiana must be performed in good faith. La. C.C. art. 1983. An obligor who performs a contract in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform. La. C.C. art. 1997. The Official Comment to La. C.C. art. 1997(b) provides that an obligor is in bad faith if he "intentionally and maliciously fails to perform his obligation." Bad faith has been defined as involving actual or constructive fraud or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. *First Nat. Bank of Jefferson Par. v. Dazet*, 95-98 (La. App. 5 Cir. 5/30/95), 656 So.2d 1110, 1113; *1100 S. Jefferson Davis Parkway, LLC v. Williams*, 14-1326 (La. App. 4 Cir. 5/20/15), 165 So.3d 1211, 1217, *writ denied*, 15-1449 (La. 10/9/15), 178 So.3d 1005. Bad faith has been characterized as "fraud, deception, or sinisterly-motivated nonfulfillment of an obligation." *Id*.

Mr. Tonti testified that he expected to receive the deposit by the end of the day on Thursday. He did not ask about the deposit on Friday. When Ms. Kramer informed him the deposit had not been paid on Monday, he called Mr. McHenry to ask for his "opinion."[12] Mr. McHenry then sent the letter to notify Renton that the

---

[12] Ms. Kramer testified that Mr. Tonti told her to call Mr. McHenry for his legal opinion since he thought it sounded like "it's null and void."

purchase agreement was null and void and without any force or effect. Given Mr. McHenry's advice, Mr. Tonti told Ms. Kramer not to accept the deposit when Mr. Mullin attempted to deliver it on Monday. Mr. Tonti thought the requirement for paying the deposit "immediately" was not satisfied by Monday. He testified he understood that the contract was terminated because Mr. McHenry said it was terminated. Once the contract was terminated, he believed he could do whatever he wanted to do with the property. Mr. Tonti admitted at trial that he could have accepted the deposit when it was delivered on Monday, but he did not because he had a backup offer for $75,000.00 more and a faster closing. Upland, therefore, moved forward with the Cannon backup offer.

Mr. McGoey testified that he informed Mr. McHenry that he believed the contract was still in effect pursuant to the terms of the contract, and he and Mr. McHenry went through the provisions of the contract together. He informed Mr. McHenry that it was a breach for them to refuse to accept the deposit, but that did not render the contract null and void. Mr. McGoey informed Mr. McHenry that if the parties could not agree on a resolution by Friday, August 25, 2017, Mr. McGoey would file a lawsuit and a notice of *lis pendens*. Mr. McGoey did not speak with Mr. Tonti. Mr. Tonti testified he knew Renton was unhappy, anticipated that it would be filing a lawsuit, and felt it was in his best interest to close on the Cannon sale as soon as possible.

Upon review, we find there is no reasonable basis in the record to find that Upland acted in bad faith in breaching the contract. There was no evidence that Mr. Tonti acted maliciously when he refused to accept the deposit on Monday morning. In his opinion and in the opinion of his counsel, Renton did not pay the deposit "immediately." His counsel informed him not to accept the deposit and informed him that because Renton did not pay the deposit "immediately," the purchase agreement was null and void. Renton is correct that the purchase

agreement does not say that a breach of the contract results in rendering it null and void.  However, we do not find Upland to be in bad faith by relying on counsel's advice and moving forward with the Cannon sale.  "[R]elying on advice of counsel is encouraged under the law and supported by our jurisprudence."  *See Healthlogic Partners, L.L.C. v. Owen*, 22-47 (La. App. 5 Cir. 11/2/22), 362 So.3d 824, 839, *writ denied*, 22-01885 (La. 2/24/23), 356 So.3d 334, citing *McClanahan v. McClanahan*, 11-284 (La. App. 5 Cir. 12/28/11), 82 So.3d 530 (holding that a defendant's reliance on advice of counsel is a valid defense in a suit for damages for malicious prosecution).  Also, no evidence whatsoever was presented showing that Mr. McGoey was prevented from filing Renton's lawsuit sooner than when it was filed on Friday.  We do not find that the evidence showed that Upland's actions "involved actual or constructive fraud or a design to mislead or deceive another."

Accordingly, we find there is a reasonable basis in the record for the jury's finding that Renton did not breach the contract and that Upland did breach the contract, but do not find there is a reasonable basis in the record for the jury's finding of a bad faith breach of the contract by Upland.  Thus, the jury manifestly erred and was clearly wrong in this regard.

### UPLAND'S ASSIGNMENT OF ERROR NUMBER THREE

#### *Is Renton only entitled to stipulated damages?*

Upland argues that even if it breached the purchase agreement, and whether it was in bad faith or not, the stipulated damages clause in the purchase agreement caps all damages at "the return of [Renton's] deposit in full, plus an equal amount to be paid as penalty."  Upland argues the trial court erred in denying its pretrial motion for summary judgment on this issue.

Under Louisiana law, parties to a contract may stipulate the damages to be recovered where there is a nonperformance, defective performance, or delay in

performance of an obligation. La. C.C. art. 2005. That stipulation gives rise to a secondary obligation for the purpose of enforcing the principal one. *Id.* A stipulated damages clause is designed to fix the measure of damages in advance and to help ease the burden of proving loss with certainty. *Hussain v. Khan*, 14-65, (La. App. 5 Cir. 5/21/14), 142 So.3d 281, 283. No showing of pecuniary or other actual damage is required to enforce the clause. *Henderson v. Ayo*, 11-1605 (La. App. 4 Cir. 6/13/12), 96 So.3d 641, 646. Stipulated damages may not be modified by the court unless they are so manifestly unreasonable as to be contrary to public policy. La. C.C. art. 2012.

Upon an obligor's failure to perform an obligation to execute an instrument, the court shall grant specific performance, if demanded by the obligee. La. C.C. art. 1986. There is "a right to specific performance for breach of contract except when it is impossible, greatly disproportionate in cost to the actual damage caused, no longer in the creditor's interest, or of substantial negative effect upon the interests of third parties." *Charter School of Pine Grove, Inc. v. St. Helena Parish School Bd.*, 07-2238 (La. App. 1 Cir. 2/19/09), 9 So.3d 209, 222; *Bourgeois v. Dunn*, 01-1185 (La. App. 1 Cir. 6/21/02), 822 So.2d 708, 711.

Regarding the stipulated damages, the Renton Agreement states:

> BREACH OF AGREEMENT BY SELLER: In the event SELLER fails to comply with this agreement, for any reason other than inability to deliver a MERCHANTABLE title, within the time specified, PURCHASER shall have the right to demand specific performance; or, at PURCHASER'S option, PURCHASER shall have the right to demand the return of his deposit in full, plus an equal amount to be paid as penalty by SELLER. In either event, PURCHASER shall have the right to recover any costs and/or fees, including expenses and reasonable attorney's fees, incurred as a result of this agreement or breach thereof.

Renton argues in opposition that by the terms of the purchase agreement, it had the choice between two alternate remedies: specific performance or stipulated damages. Since Renton remained willing and able to buy the property prior to

Upland's closing with Cannon, it was solely Upland's fault that specific performance became impossible. Because of this, Renton asserts it is entitled to actual damages pursuant to La. C.C. art. 1812.[13]

In the present case, there has been no argument that the stipulated damages were unreasonable, nor do we find that any evidence was presented showing that the stipulated damages were so manifestly unreasonable so as to be contrary to public policy. As Renton admits and as the jury was informed, specific performance was rendered impossible with the sale to Cannon.[14] With specific performance impractical, the purchase agreement then states that damages were limited to "the return of his deposit in full, plus an equal amount to be paid as penalty by SELLER … [and] … the right to recover any costs and/or fees, including expenses and reasonable attorney's fees, incurred as a result of this agreement or breach thereof." We find that Renton limited its own damages by waiting to file its lawsuit and notice of *lis pendens*, seeking specific performance. *See 1100 S. Jefferson Davis Parkway*, 165 So.3d at 1220. Mr. McGoey testified that Renton's lawsuit was drafted on Tuesday. As previously stated, no evidence was presented showing that Mr. McGoey was prevented from filing Renton's lawsuit sooner than when it was filed on Friday.

Therefore, we find the jury erred in not finding that the purchase agreement limited the amount that Renton could recover as stipulated damages to "the return of [its] deposit in full, plus an equal amount to be paid as penalty." However, in

---

[13] Renton cites to La. C.C. art. 1812, which concerns "alternative obligations." With an alternative obligation, there is only one obligation and the obligor performs said obligation by rendering performance with an object that he has chosen among at least two different ones. A stipulated damages clause gives rise to one obligation that is secondary to a different principal obligation. *See* 6 La. Civ. L. Treatise, Law of Obligations § 13.11 (2d ed.). We do not find La. C.C. art. 1812 to be applicable here.

[14] Following a hearing on July 20, 2022, the trial court signed a written judgment on the same date finding that the Cannon Act of Sale is effective as an Act Under Private Signature.

In the jury instructions, the trial court informed the jury that "[s]pecific performance awarding the property to Renton Properties LLC is not an available remedy."

this case, since the deposit of $20,000.00 was never paid, we find Renton is limited to stipulated damages in the amount of $20,000.00 (an amount equal to the deposit), plus "any costs and/or fees, including expenses and reasonable attorney's fees" incurred as a result of the agreement or the breach thereof.[15]

### TONTI DEFENDANTS' ASSIGNMENTS OF ERROR NUMBERS TWO AND THREE

***Did defendants commit fraud and violate LUTPA?***

On appeal, defendants argue the trial court erred in finding Mrs. Tonti and Mr. Tonti personally liable for actions taken on behalf of Upland, an LLC, and entering a judgment against them for acts of fraud and violations of LUTPA.

*Fraud*

Defendants contest Renton's assertion that they acted fraudulently by omission – by failing to tell Renton about the backup offer and by selling the property to Cannon without notice. Defendants contend they had no fiduciary duty to Renton to support a claim of fraud by omission. Defendants argue that Mrs. Tonti was not involved with any of the transactions, and she cannot be found personally liable just because she is Upland's sole owner. As to Mr. Tonti, defendants argue he only moved forward with the Cannon sale once Mr. McHenry informed him the Renton Agreement was null and void.

Renton argues there is ample evidence of a "tapestry of deception," and the reasonable conclusion is that Mrs. Tonti and Mr. Tonti acted with the intention of defeating Renton's rights to purchase the property. Renton contends Mr. Tonti was fraudulent when he did the following: misled Ms. Duffy by not giving her the Cannon counter-offer; had Mr. McHenry send the letter stating that the contract was null and void; informed the agents not to accept Renton's check; had Mr.

---

[15] The parties on appeal argued a finding of bad faith did not limit Renton to the stipulated damages. Having found no bad faith, we pretermit any discussion on whether a bad faith breach of contract limited the non-breaching party to the stipulated damages.

McHenry mislead Mr. McGoey; had Mr. Cannon rush to close; and admitted he knew a lawsuit was coming. Renton argues Mrs. Tonti committed acts of fraud when she: executed a forged and false act of sale; violating two criminal statutes; had the money from the sale go to Ohio Management to make Upland insolvent; and was responsible for Mr. Tonti's actions as he was her agent.

Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. La. C.C. art. 1953. Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill. This exception does not apply when a relation of confidence has reasonably induced a party to rely on the other's assertions or representations. La. C.C. art. 1954; *Korrapati v. Augustino Bros. Constr.*, *LLC*, 19-426 (La. App. 5 Cir. 7/31/20), 302 So.3d 147, 154. Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence. La. C.C. art. 1957.

The law considers an LLC and the member(s) comprising the LLC as being wholly separate persons. *See* La. C.C. art. 24; *Ogea v. Merritt*, 13-1085 (La. 12/10/13), 130 So.3d 888, 894-95. In narrowly defined circumstances, when individual member(s) of a juridical entity such as an LLC mismanage the entity or otherwise thwart the public policies justifying treating the entity as a separate juridical person, the individual member(s) have been subjected to personal liability for obligations for which the LLC would otherwise be solely liable. *Id.* at 895.

The operation of limited liability companies in Louisiana is governed by La. R.S. 12:1301, *et seq*. La. R.S. 12:1320(D) sets forth a statutory exception to the general rule regarding an LLC member's liability and states:

> Nothing in this Chapter shall be construed as being in derogation of any rights which any person may by law have against a member, manager, employee, or agent of a limited liability company because of

any fraud practiced upon him, because of any breach of professional duty or other negligent or wrongful act by such person, or in derogation of any right which the limited liability company may have against any such person because of any fraud practiced upon it by him.

Because La. R.S. 12:1320(D) does not define fraud, the Louisiana Civil Code's definition of fraud governs. *Ogea*, 130 So.3d at 897-98.

To find fraud from silence or suppression of the truth, there must exist a duty to speak or to disclose information. *Greene v. Gulf Coast Bank*, 593 So.2d 630, 632 (La. 1992). Whether one party owes another a duty to speak depends on the nature of the relationship between the parties and the nature of the information allegedly suppressed. *Louisiana State Univ. Sys. Research & Tech. Found. v. Qyntessa Biologics, L.L.C.*, 14-0311 (La. App. 1 Cir. 12/12/14), 168 So.3d 468, 474. It has long been held that the duty to disclose exists where the parties stand in some confidential or fiduciary relation to one another.[16] *Id*.

Considering the record before us, we find the jury manifestly erred and was clearly wrong in finding Mrs. Tonti and Mr. Tonti personally liable for fraud.

Mrs. Tonti testified at trial that she gave Mr. Tonti full authority to act on her behalf. She did not participate in the negotiations and had no knowledge of the purchase agreements. She admitted Ms. Riviere was the only one present when she signed the act of sale. Though the act of sale was not signed in the presence of Mr. McHenry, the notary, the trial court found that it was still effective as an Act Under Private Signature. She also testified that the money was put into Ohio Management's account since it was a long-standing business.

Mr. Tonti stated that his mother asked him to help sell the property and he acted on her behalf. When he was informed the deposit had not been delivered on

---

[16] Louisiana courts have recognized that traditional fiduciary relationships exist (whether or not the parties are contractually bound) between real estate brokers/agents and sellers/purchasers, trustees and trusts, financial lenders and borrowers, attorneys and clients, directors and shareholders, executors and estates, public officers and the public, and guardians and wards. *Price v. North*, 21-0236 (La. App. 1 Cir. 10/18/21), 331 So.3d 959, 972.

Monday morning, he sought Mr. McHenry's opinion. He took Mr. McHenry's advice and did not accept the late deposit check. Further, based on Mr. McHenry's counsel, he understood the purchase agreement to be null and void. There is no evidence that Mr. Tonti had Mr. McHenry send the letter stating the contract was null and void. Nor is there any evidence that he had Mr. McHenry "mislead" or make any misrepresentations to Mr. McGoey. Once he understood the purchase agreement to be null and void, based on the advice of his counsel, he moved forward with the Cannon sale. He testified he did not resign the Cannon purchase agreement so that Ms. Duffy would not see the counter-offer; rather, Ms. Duffy did not get the counter-offer because at that point there no longer was a counter-offer.

Mr. Tonti admitted he knew Renton was unhappy and a lawsuit would be coming. However, there is no evidence that he rushed the closing or mislead Renton from taking any action prior to the closing. Ms. Duffy testified she handled many of Mr. Cannon's previous closings and it was not unusual for him to "rush" his closings. She testified it was Mr. Cannon who told her he wanted the get the sale done as soon as possible. Mr. McGoey testified he had Renton's suit drafted on the Tuesday before the Cannon sale on Friday. Again, no evidence was presented to indicate that Mr. McGoey was prevented from filing Renton's suit and the notice of *lis pendens* prior to when he did on Friday.

As to any fraud by silence by Mrs. Tonti and Mr. Tonti, we find they did not have a fiduciary relationship with Renton such that they owed a duty to tell Renton about the sale to Cannon.

Accordingly, we find from the record that a reasonable factual basis does not exist for the jury's finding of fraud, and thus, the jury manifestly erred and was clearly wrong in this regard.

*Violations under LUTPA*

Defendants also argue Mrs. Tonti and Mr. Tonti acted within the bounds of a normal business practice and their conduct was not a violation under LUTPA. La. R.S. 51:1405(A) prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." The purpose of LUTPA is to protect consumers and to foster competition by "halting unfair business practices and sanctioning the businesses which commit them, preserving and promoting effective and fair competition, and curbing business practices that lead to a monopoly and unfair restraint of trade within a certain industry." *Quality Envtl. Processes, Inc. v. I.P. Petroleum Co.*, 13-1582 (La. 5/7/14), 144 So.3d 1011, 1025. What Louisiana courts deem a violation of LUTPA is determined on a case-by-case basis. *Monroe v. McDaniel*, 16-214 (La. App. 5 Cir. 12/7/16), 207 So.3d 1172, 1179.

The Louisiana Supreme Court has explained that "the range of prohibited practices under LUTPA is extremely narrow," as LUTPA prohibits only fraud, misrepresentation, and similar conduct, and not mere negligence. *Quality Environmental*, *supra*. Further, "conduct that offends established public policy and is unethical is not necessarily a violation under LUTPA." *Id.* "[O]nly egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct will be sanctioned based on LUTPA." *Cheramie Services, Inc. v. Shell Deepwater Prod.*, 09-1633 (La. 4/23/10), 35 So.3d 1053, 1060. A defendant's motivation is a critical factor—his actions must have been taken with the specific purpose of harming the competition. *Creative Risk Controls, Inc. v. Brechtel*, 01-1150 (La. App. 5 Cir. 4/29/03), 847 So.2d 20, 24, *writ denied*, 03-1769 (La. 10/10/03), 855 So.2d 353.

For the same reasons we found the jury manifestly erred and was clearly wrong in finding that Mrs. Tonti and Mr. Tonti committed fraud, we find the jury

manifestly erred and was clearly wrong in finding Mrs. Tonti and Mr. Tonti's actions constituted a LUTPA violation. The record before us does not support a finding that Mrs. Tonti and Mr. Tonti's conduct was egregious and that they acted with the specific purpose of harming Renton. The record shows that Upland and Mr. Tonti went forward with the Cannon sale, whom they had a valid backup offer with, after counsel advised Mr. Tonti that the purchase agreement was null and void. We find from the record that a reasonable factual basis does not exist for the jury's finding that Renton proved by a preponderance of the evidence that Mrs. Tonti or Mr. Tonti committed an act or practice which constitutes an unfair trade practice under LUTPA.

Having found both that damages are limited to $20,000.00, plus costs and attorney's fees, under the stipulated damages clause, and that there was insufficient evidence to conclude Mrs. Tonti and Mr. Tonti committed fraud or an act or practice which constitutes an unfair trade practice, we reduce the damages award of $2,067,400.00 and the treble damage awards of $206,740.00 and $3,514,580.00, to the stipulated damages amount of $20,000.00 against Upland, plus costs and attorney's fees.

### RENTON'S ASSIGNMENT OF ERROR NUMBER FOUR IN ITS ANSWER TO THE APPEAL

*Was Mrs. Tonti the alter ego of Upland?*

Renton argues in its answer to the appeal that the trial court erred in failing to grant its JNOV and failing to find that Upland is the alter ego of Mrs. Tonti, such that Mrs. Tonti is personally liable for the debts, obligations, and liabilities owed by Upland. Renton asserts it proved Upland was the alter ego of Mrs. Tonti since Upland is a single asset, single member LLC with no business or bank accounts. The money from the sale went to Ohio Management, thereby rendering Upland insolvent. Further, an individual member of an LLC can be personally

liable in cases of fraud, and the jury found that Mrs. Tonti's actions constituted fraud.

Renton also argues in its answer that the trial court's jury instruction on alter ego was legally erroneous because it instructed the jury that members and LLCs are not alter egos of each other and because it only included two *Riggins* factors.

A JNOV is warranted when the facts and reasonable inferences point so strongly and overwhelmingly in favor of the moving party that the court believes that reasonable jurors could not arrive at a contrary verdict, not merely where there is a preponderance of evidence for the mover. *Davis v. Wal-Mart Stores, Inc.*, 00-445 (La. 11/28/00), 774 So.2d 84, 89. When a motion for judgment notwithstanding the verdict is denied, the appellate court simply reviews the record to determine whether there is legal error or whether the trier of fact committed manifest error. *Barnett v. Woodburn*, 20-0675 (La. 1 Cir. 4/16/21), 324 So.3d 641, 650.

Trial courts are given broad discretion in formulating jury instructions. *Adams v. Rhodia, Inc.*, 07-2110 (La. 5/21/08), 983 So.2d 798, 804. An appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions. *Id.* But when a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. *Id.* In the assessment of an alleged erroneous jury instruction, it is the duty of the reviewing court to assess such impropriety in light of the entire jury charge to determine if the instructions adequately provide the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the instructions adequately guided the jury in its deliberation. *Id.* Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. *Id.*

With regard to the jurisprudential doctrine of "piercing the corporate veil," Louisiana courts have allowed a piercing of the corporate veil under only two exceptional circumstances, namely: where the corporation is an alter ego of the shareholders and the shareholders have used the corporation to defraud a third party (the "alter ego" doctrine); and where the shareholders have failed to conduct a business on a "corporate footing" to such an extent that the corporation ceases to be distinguishable from its shareholders. *Riggins v. Dixie Shoring Co., Inc.*, 590 So.2d 1164, 1168 (La. 1991). When a party seeks to pierce the corporate veil, the totality of the circumstances is determinative. In order to properly disregard the corporate entity, one of the primary components which justifies piercing the veil is often present: to prevent the use of the corporate form in the defrauding of creditors. *Id.* at 1169. Some of the relevant factors considered in determining whether to apply the alter ego doctrine include: commingling of corporate and shareholder funds; failing to follow statutory formalities for incorporating and transacting corporate affairs; undercapitalization; failing to maintain separate bank accounts and bookkeeping records; and failing to hold regular shareholder and director meetings. *Id.* at 1168.

The jury instruction in the present case relating to alter egos and piercing the corporate veil states as follows:

> The following are the principles to consider when determining whether to apply the alter ego or corporate-veil-piercing doctrine to a member or agent of an LLC:
>
>> The limited liability attendant to being a member, manager, employee or agent of an LLC should be disregarded only in exceptional circumstances. In the absence of fraud, the plaintiff bears a heavy burden of proving that a member, or an agent for the LLC, disregarded the LLC entity to such an extent that it ceased to become distinguishable from themselves. Some factors to consider when determining whether to apply the alter ego doctrine are: 1) failure to follow statutory formalities for forming an LLC and transacting LLC affairs; 2) failure to provide a separate bank account for the LLC. The fact that the

> LLC has only one individual member does not make that individual liable for the debts of the LLC.
>
> Louisiana courts are reluctant to hold a member or agent of an LLC personally liable for obligations of the LLC in the absence of fraud, malfeasance, or criminal wrongdoing.

Under the jury instruction on "Damages for Bad Faith Breach of Contract," the jury was instructed: "An LLC is considered to be a 'juridical person,' which means that it is its own legal person. An LLC and its members are wholly separate persons. A limited liability company and its members are not alter egos for each other."

Upon review of the subject jury instructions, we find no error in the trial court's broad discretion in formulating the jury instructions. Renton says the trial court erred by not including the following *Riggins* factors: commingling of corporate and shareholder funds; undercapitalization, causing insolvency; and diversion of assets. However, we find Renton has failed to show how not including these elements misled the jury to the extent that it was prevented from dispensing justice. Further, though the trial court improperly stated in its jury instruction on bad faith breach of contract that LLCs and its members "are not alter egos for each other," we find that this did not mislead the jury from dispensing justice, as the jury made a finding that Ohio Management was the alter ego of Mrs. Tonti and Mr. Tonti.

Additionally, we find the evidence supported the jury's verdict that Upland is not the alter ego of Mrs. Tonti. At trial, Mrs. Tonti confirmed she became the sole owner of Upland following the death of her husband. Upland's only asset was the property in question. Mrs. Tonti asked Mr. Tonti to sell the property. She did not participate in any of the negotiations and had no knowledge of the purchase agreements. She admitted she signed a document on the day of the Cannon sale allowing the sale proceeds to go to Ohio Management. She also testified the money went to Ohio Management because it was a long-standing business. There

was no evidence presented that she intended to defraud Renton with this action. Further, having already found that Mrs. Tonti did not commit any acts of fraud, we find no error in the jury's finding that Upland is not Mrs. Tonti's alter ego.

## TONTI DEFENDANTS' ASSIGNMENT OF ERROR NUMBER FOUR

### *Should Ohio Management have been cast in judgment?*

Defendants argue the trial court erred by casting Ohio Management in judgment when the jury found Ohio Management to be free from fault.[17] Defendants argue that questions 4 and 5 on the jury verdict sheet only ask if "any defendants" committed fraud or violated LUTPA; it did not specify which defendants. Question 7 asked if Renton proved that Ohio Management is the alter ego of either Mrs. Tonti or Mr. Tonti, such that they would be personally liable for any debts owed by Ohio Management, and the jury responded yes to both. However, in response to question 8, the jury only assigned a percentage of fault to Mrs. Tonti, Mr. Tonti, and Corporate Realty (a previously settled party). Ohio Management was not assigned any fault. Yet in the trial court's written judgment, it found all four defendants solidarily liable. Defendants assert that since Ohio Management was found to be free from fault, Ohio Management owed no debts, obligations, or liabilities to Renton.

> Louisiana Code of Civil Procedure art. 1916(A) provides:
>
> After a trial by jury, the court shall prepare and sign a judgment in accordance with the verdict of the jury within ten days of the rendition of the verdict, or the court may order counsel for a party in the case to prepare and submit a judgment to the court for signature within ten days of the rendition of the verdict, in accordance with the rules for Louisiana district courts.

Additionally, La. C.C.P. art. 1812(D) regarding special verdicts states, "the court shall then enter judgment in conformity with the jury's answers to these special questions and according to applicable law."

---

[17] Defendants did object to this matter in its JNOV, which the trial court denied.

"[T]here is no provision for a jury's verdict to be considered 'advisory,' thereby allowing the trial court to interpret the jury's verdict or substitute its own findings of fact." *Scott v. Am. Tobacco Co., Inc.*, 04-2095 (La. App. 4 Cir. 2/7/07), 949 So.2d 1266, 1273, *writ denied*, 07-0662 (La. 1/7/08), 973 So.2d 740, and *writ denied*, 07-0654 (La. 1/7/08).

In the present case, the jury found that "defendants" committed fraud and violated LUTPA, but when assigning fault, the jury assigned "0" fault to Ohio Management – meaning the jury did not find any fault by Ohio Management, or the jury did not find that any fault by Ohio Management caused damage to Renton. Therefore, the trial court failed to conform to the jury's verdict as required by La. C.C.P. arts. 1812 and 1916 when entering its judgment. As such, we reverse the trial court's erroneous judgment finding Ohio Management liable for Renton's damages.

## REMAINING ASSIGNMENTS OF ERROR

Based on our holdings herein, the remaining assignments of error are pretermitted.

## RENTON'S REQUEST FOR ADDITIONAL ATTORNEY'S FEES ON APPEAL

We decline to award Renton additional attorney's fees on appeal.

## DECREE

For the foregoing reasons, the jury verdict finding that Upland breached its contract with Renton is affirmed. The jury verdict finding that Upland breached the contract with Renton in bad faith is reversed. The jury verdict and judgment against Mrs. Tonti, Mr. Tonti, and Ohio Management are reversed. The jury's award of damages in favor of Renton against Upland is amended and reduced from $2,067,400.00 to the stipulated damages amount of $20,000.00, plus legal interest thereon from the date of judicial demand until paid. The award of attorney's fees

and costs to Renton as follows are affirmed:[18] attorney's fees in the amount of

$233,703.00, plus legal interest thereon from February 17, 2023 until paid; expert

witness fees in the amount of $26,683.33; deposition costs in the amount of

$2,949.15; and court costs in the amount of $18,324.61.  Finally, the treble

damages award to Renton is reversed.

**AFFIRMED IN PART; AMENDED IN PART; REVERSED IN PART**

---

[18] In a footnote in Upland's brief, in the discussion surrounding the stipulated damages clause, Upland objected to the attorney's fee award in its entirety since the "prolonged litigation was unnecessary based on the contracted-for stipulated damages clause."  However, defendants did not assign as error or brief the trial court's award of attorney's fees and costs in favor of Renton.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **DECEMBER 27, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 23-CA-479

### E-NOTIFIED

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE JUNE B. DARENSBURG (DISTRICT JUDGE)

ANDREA V. TIMPA (APPELLEE)
ALIXE L. DUPLECHAIN (APPELLANT)
THOMAS M. FLANAGAN (APPELLANT)
MADELEINE FISCHER (APPELLANT)

PATRICK S. MCGOEY (APPELLEE)
ANDERS F. HOLMGREN (APPELLANT)
JEFFERSON R. TILLERY (APPELLANT)
GERALD A. MELCHIODE (APPELLEE)

ROBERT L. RAYMOND (APPELLEE)
CAMILLE E. GAUTHIER (APPELLANT)
JESSICA S. ALLAIN (APPELLANT)
RENEE S. MELCHIODE (APPELLEE)

### MAILED

KANSAS M. GUIDRY (APPELLANT)
ATTORNEY AT LAW
201 ST. CHARLES AVENUE
SUITE 3300
NEW ORLEANS, LA 70170

JONATHAN G. WILBOURN (APPELLEE)
REMINGTON M. ANGELLE (APPELLEE)
ATTORNEYS AT LAW
301 MAIN STREET
SUITE 1400
BATON ROUGE, LA 70801

DOMINIC A. CIACCIO (APPELLEE)
JAMES J. REEVES, II (APPELLEE)
ATTORNEYS AT LAW
639 LOYOLA AVENUE
SUITE 1800
NEW ORLEANS, LA 70113